40th JUDICIAL DISTRICT COURT FOR THE PARISH OF ST. JOHN THE BAPTIST

STATE OF LOUISIANA

DOCKET NO.



LAMAR ELLIS ET. AL.

VERSUS

EVONIK CORPORATION, ET. AL.

FILED:_____          _____

                                                    DEPUTY CLERK

Eliana DeFrancesch - Clerk of Court
Filed: Apr 26, 2021  8:45 AM

134379056

## PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY

The Plaintiffs, through their undersigned counsel, represent, upon their information and belief, the following:

### INTRODUCTION

1.  This lawsuit seeks redress for people who have lived near a petrochemical manufacturing facility in Reserve, Louisiana operated by Evonik Corporation, and previously operated by Evonik Materials Corporation, Versum Material Performance Manufacturing, Inc., Air Products Performance Manufacturing, Inc., Tomah Reserve, Inc. and Shell Oil Company ("the facility") that has emitted dangerous levels of Ethylene Oxide ("EtO") for decades and which continues to emit dangerous levels of EtO as of the filing of this Petition. All Plaintiffs in this suit have all contracted cancer as a result of the emission of EtO from the facility, except for three plaintiff who are brining claims related to family members who have died of cancer as a result of the emission of EtO from the facility, and the Plaintiffs continue to be at risk for developing additional health problems in the future due to their continued exposure to EtO from the facility which has never abated at any time. The Defendants have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding the facility in order to maximize their profits without ever informing Plaintiffs or the rest of the surrounding community of the life-threatening effects the facility's EtO emissions.

2.  EtO is a cancer-causing gas.

EXHIBIT
A

NON-CERTIFIED COPY

3.  The United States Environmental Protection Agency (EPA), the National Toxicology Program, the World Health Organization, and the International Agency for Research on Cancer (IARC) all classify EtO as a known human carcinogen.

4.  Over decades and continuing to the present day, the facility has emitted many hundreds of tons of EtO into the air, forcing Plaintiffs to breathe its toxic emissions day after day.

5.  Although the owners and operators of the facility know and have long known of hazards of EtO, they have chosen to protect their profits rather than the health of their neighbors and have continued to emit dangerous levels of EtO, a carcinogen, in amounts that caused the surrounding communities to have dangerously high EtO concentrations.

6.  EtO is colorless and odorless and therefore Plaintiffs have never been able to see or smell the EtO that is in the air around them and which they have breathed.

7.  Plaintiffs were unknowingly exposed to and inhaled dangerous levels of EtO in the air from the facility.

8.  The Plaintiff's inhalation of the EtO emitted from the facility was a substantial factor in causing them to develop cancer.

9.  The continued emission of EtO from the facility continues to cause damage by weakening Plaintiff's current medical condition and increasing the risk of Plaintiffs' developing new health problems.

## JURISDICTION AND VENUE

10. Venue is proper in this judicial district pursuant to Louisiana Code of Civil Procedure Articles 42, 73 and 74 because St. John the Baptist it is the domicile Evonik Materials Corporation, it is where the wrongful conduct of defendants occurred, and it is the parish where Plaintiffs have sustained damages.

11. This Court has original jurisdiction over this action as a court of general jurisdiction authorized to conduct both ordinary and special proceedings, including awarding damages, costs, and attorney's fees for tortious conduct and violations of Louisiana law.

## PLAINTIFFS

12. Lamar Ellis, individually on behalf of his deceased wife Gaynell Perrilloux-Ellis, is a person of the age of majority is who is domiciled in St. John the Baptist parish. Mr. Ellis has been and continues to be exposed to EtO from the facility at his home located at 3033 English Colony, Laplace LA 70068 where his wife Gaynelle Perrilloux-Ellis also lived with him

2

NON-CERTIFIED COPY

beginning in 2005. Ms. Perilloux-Ellis died of breast cancer at the age of 51 on February 6, 2020.  Mr. Ellis continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

13. Leroy Fortado Sr., individually and on behalf of Mary Ann Fortado is a person of the age of majority is who is domiciled in St. John the Baptist parish. Mr. Fortado has been and continues to be exposed to EtO from the facility at his home located at 2512 Yorktowne Dr. Laplace, LA 70068 where his wife Mary Ann Fortado also lived with him beginning in approximately 1993. Ms. Fortado died of breast cancer at the age of 64 on September 26, 2018.  Mr. Fortado continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

14. Kathrine Foster is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Foster has been and continues to be exposed to EtO from the facility at her home located at 146 Rosenwald St, Reserve, LA, 70084 where she has lived for forty-eight years. She is 71 years old and was diagnosed with breast cancer on May 13, 2019. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

15. Ervin Jack, Jr. on behalf of his wife Leander Cook Jack is a person of the age of majority is who is domiciled in St. John the Baptist parish. Mr. Jack has been and continues to be exposed to EtO from the facility at his home located at 208 East 20th, Reserve, LA  70008 where his wife also lived with him dating back to the 1970s. Ms. Jack died of breast cancer in 2000. Mr. Jack continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

16. Joyce Johnson is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Johnson has been and continues to be exposed to EtO from the facility at her home located at 130 w 4th St., Reserve LA 70084. She is 71 years old, has lived in Reserve her entire life, and was diagnosed with breast cancer in January of 2020. She continues to experience adverse health effects because of the continued emission of EtO from the facility

3

NON-CERTIFIED COPY

and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

17. Geneiva Jones is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Jones has been and continues to be exposed to EtO from the facility at her home located at 1038 Gemini Dr Reserve, LA 70084 where she has lived for 47 years. She is 68 years old and was diagnosed with breast cancer in 2016. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

18. Rosylyn Joseph is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Joseph has been and continues to be exposed to EtO from the facility at her home located at 352 E. 24th St, Reserve, LA 70084 where she has lived for thirty years. She is 60 years old and was diagnosed with breast cancer in 2010. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

19. Joan LeBeouf is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. LeBeouf has been and continues to be exposed to EtO from the facility at her home located at 112 Frances Street, Garyville, LA 70051 where she has lived since 1976. She is 65 and was diagnosed with breast cancer June 2, 2010. She continues to experience adverse health effects because of the continued emission of EtO from the facilities and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facilities.

20. Loritta Lumar is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Lumar has been and continues to be exposed to EtO from the facility at her home located at 408 Central Ave, Edgard, LA 70049 where she has lived for thirty years. She is 68 and was diagnosed with follicular lymphoma April 6, 2020. She continues to experience adverse health effects because of the continued emission of EtO from the facilities and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facilities.

4

NON-CERTIFIED COPY

21. Margie Moore is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Moore has been and continues to be exposed to EtO from the facility at her home located at 225 Marigold St., Mt Airy, LA 70076 where she has lived for decades. She is 82 and was diagnosed with breast cancer on August 27, 2014. She continues to experience adverse health effects because of the continued emission of EtO from the facilities and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facilities.

22. Ramona Simoneaux is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Simoneaux has bee be exposed to EtO from the facility at her former home located at 1700 Marseille Street #15, Laplace LA 70068 where she lived for over thirty years until 2018. She is 64 and was diagnosed with breast cancer on September 11, 2014. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

23. Aleshia Sylvain is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Sylvain has been and continues to be exposed to EtO from the facility at her home located at 327 Castle Drive, Edgard, LA 70049. She is 50, has lived in Edgard her entire life, and was diagnosed with breast cancer in June of 2018. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

24. August Tassin, Jr. is person of the age of majority who is domiciled in St. John the Baptist parish. Mr. Tassin has been and continues to be exposed to EtO from the facility at his home located at 147 Chestnut St. Mount Airy, LA 70076. He is 73, has lived in Mt. Airy his entire life, and was diagnosed with multiple cell lymphoma and kidney cancer in 1999. He continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

25. Ginger Villa is person of the age of majority who is domiciled in St. John the Baptist parish. Ms. Villa has been and continues to be exposed to EtO from the facility at her former home located at 178 Parker Ln., Reserve LA 70084 where she lived from 2005 to 2009. She is 42

NON-CERTIFIED COPY

years old and was diagnosed with Hodgkin's Lymphoma in April of 2012. She continues to experience adverse health effects because of the continued emission of EtO from the facility and is at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility.

## DEFENDANTS.

26. Evonik Corporation ("Evonik") is a corporation organized under the laws of Alabama with its principal place of business in New Jersey that currently operates the facility.

27. Evonik Materials Corporation ("EMC") is a corporation organized under the laws of Delaware with its principal place of business in Reserve, LA that operated the facility from 2017 to 2019.

28. Versum Materials Performance Manufacturing, Inc. ("Versum") is a corporation organized under the laws of Delaware that had its principal place of business in Reserve, LA that formerly operated the facility in 2016.

29. Air Products Performance Manufacturing, Inc., ("APPMI") is a corporation organized under the laws of Delaware that had a principal place of business in Louisiana and previously operated the facility from 2007 to 2016.

30. Tomah Reserve, Inc. ("Tomah") is a corporation organized under the laws of Delaware that had its principal place of business in Reserve, LA that formerly operated the facility from 1999 to 2007.

31. Shell Oil Co. ("Shell") is a corporation organized under the laws of Delaware with its principal place of business in Houston, TX that formerly operated the facility from 1991 to 1999.

32. Randy Cashio is a person of the full age of majority who is domiciled in St. James parish. Mr. Cashio is a site manager of the facility who was a designated "Permit Responsible Official" on permits issued by the LDEQ that apply to EtO emissions from the facility in 2019 and 2020.

33. James Carter is a person of the full age of majority who is domiciled in St. Charles parish. Mr. Carter was a site manager who was a designated "Permit Responsible Official" on permits issued by the LDEQ that apply to EtO emissions from the facility in 2017.

NON-CERTIFIED COPY

34. Artis Williams is a person of the full age of majority who is domiciled in Ascension parish. Mr. Williams was a unit manager who was a designated "Permit Responsible Official" on permits issued by the LDEQ that apply to EtO emissions from the facility in 2016.

35. Kerry Harrison is a person of the full age of majority domiciled in St. Charles parish. Mr. Harrison was a unit manager who was a designated "Permit Responsible Official" on permits issued by the LDEQ that apply to EtO emissions from the facility in 2008.

## FACTUAL BACKGROUND

36. Ethylene oxide is a flammable, colorless gas used to make other chemicals that are used in making a range of products, including antifreeze, textiles, plastics, detergents and adhesives. Ethylene oxide also is used to sterilize equipment and plastic devices.[1]

37. The facility emits huge volumes of EtO every year into the community where Plaintiffs reside, and the emissions continue at this time.

38. People cannot see or smell ethylene dioxide and, consequently, Plaintiffs have been exposed to EtO from the facility for many years without their knowledge while Defendants knew, or should have known, that that the EtO from the facility was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

39. EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic. EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades in the industrial community, but not to the general population.

40. Studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Studies also show that long-term exposure to EtO increases the risk of breast cancer.

41. The DNA-damaging properties of EtO have been studied since the 1940s.

---

[1]     https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

NON-CERTIFIED COPY

42. U.S. companies became broadly aware of EtO's carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health (NIOSH) recommended that EtO be considered as mutagenic and potentially carcinogenic to humans.[2]

43. In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[3]

44. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

45. California declared EtO as a human carcinogen in 1987.

46. In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification.

47. In 2000, the U.S. Department of Health and Human Services revised classified EtO as "known to be a human carcinogen."

48. In 2002, the U.S. National Toxicology Program classified EtO as "known to be a human carcinogen" based on "sufficient evidence of carcinogenicity from studies in humans."

49. NIOSH published a study in 2004 found positive exposure-response trends for lymphohematopoietic cancer mortality in males and for breast cancer mortality in females.

50. An EPA advisory panel agreed in 2007 that EtO is a carcinogen and advised the EPA to make improvements to risk assessments.

51. In 2007, the American Chemistry Counsel and Ethylene Oxide/Ethylene Glycols Panel a manual regarding EtO and noting the association between EtO and breast and blood cancers.

52. In 2009, California added EtO to list of toxic substances.

53. The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults that previously thought. The EPA considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.

---

[2]    Center for Disease Control & Prevention, Special Occupational Hazard Review with Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html

[3]    Center for Disease Control, Current Intelligence Bulletin 35, May 1981, Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

NON-CERTIFIED COPY

**Emissions from the Facility**

54. The facility emits huge volumes of EtO gas every year which emissions contaminate the air in communities in proximity to the facility.

55. The EtO emitted by the facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that Plaintiffs breathe long after it has been emitted.[4]

56. People cannot see or smell ethylene oxide when it is in the air. As such, Plaintiffs have unknowingly been exposed to carcinogenic EtO for decades while Defendants knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

57. Defendants operate the facility without sufficient pollution controls to limit and/or eliminate the emissions of toxic EtO and, as a result, expose Plaintiffs to a carcinogenic, mutagenic chemical that materially diminished their health, increased their likelihood of developing cancer, and continues to increase their likelihood of developing cancer.

58. The facility continues to emit dangerous levels of EtO at the present time.

59. Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized amounts of EtO into the air and water, which releases are caused by leaks, faulty equipment, and other negligence that has increased the volume of EtO in the atmosphere around the facility and in the community, including just by way of example, multiple unauthorized releases of EtO in 2012 and 2013 that may have led to as much as 1950 lbs. of EtO being released into the atmosphere according to the facility.

**The Risk of Cancer Near the Facility is the Highest in the U.S.**

60. In August 2018, after the EPA released the results of the 2014 National Air Toxics Assessment ("NATA") of EtO (and other toxics), it became harder for the defendants to ignore or attempt to deny the hazardous nature of EtO. The 2014 NATA—which estimated concentrations of airborne toxins and population exposure and calculated the associated risks of cancer and other serious health problems—reflects that there are dangerous levels of airborne EtO in certain census tracts around the facility. Even worse, the report calculated

---

[4]   https://www.ncbi.nlm.nih.gov/books/NBK321408/

NON-CERTIFIED COPY

that individuals living in those census tracts around the facility, which include the Plaintiffs, have some of the highest risks of cancer from EtO exposure in the country, with the census tracts surrounding the facility having cancer risks from EtO that are greater than what the EPA considers an acceptable risk. On information and belief, the 2014 NATA results were not communicated to any lay persons and the citizens of St. John the Baptist Parish, although the EPA inspector general issued a management alert that called on the EPA, state, and/or local officials to provide information about EtO to Plaintiffs. There was no public awareness initiative or campaign by Defendants or the local or federal government to educate the community.

**Individuals at the Facility with Authority and the
Responsibility to Protect the Citizens of St. John the Baptist Parish
Knew the Emissions Were Dangerous, But Did Nothing.**

61. Randy Cashio, James Carter, Artis Williams, and Kerry Harrison (collectively the "Facility Manager Defendants") were each designated to the LDEQ as a Permit Responsible Official ("PRO") for the permits under which the facility operated and emitted EtO from 2008 to 2020. As PROs, the Facility Manager Defendants were certified to the state to be either officers in charge of a principal business function or to have similar policy and decision-making functions for the corporate defendants and the facility and to be authorized persons responsible for overall operations of the EtO emitting units and plants at the facility. As PROs, the Facility Manager Defendants were personally responsible for ensuring the facility's compliance with these permits. By state regulation, that personal responsibility could not be delegated further to other individuals working at the facility.

62. In connection with being designated PROs, the Facilities Manager Defendants personally certified that information provided to LDEQ regarding EtO emissions from the facility were true, accurate, and complete.

63. In connection with being a PRO, each of the Facilities Manager Defendants exercised personal responsibility, management, and control over the facility's operations and handling and emissions of EtO.

64. In connection with being a PRO, each of the Facilities Manager Defendants owed a personal duty to the community surrounding the facility, including Plaintiffs, to not emit harmful emissions of EtO from the facility that could injure the members of community, including Plaintiffs.

NON-CERTIFIED COPY

65. Not only were each of the Facility Manager Defendants responsible for ensuring that the facility complied with the LDEQ permits—they were also the individuals directly and personally responsible for overall operations related to EtO emissions from the facility and emissions controls and had to certify as such in connection with being designated as a PRO. APPMI and/or EMC delegated to the Facility Manager Defendants the duty to ensure that the operations of the facility did not endanger the neighboring community through unsafe operations or dangerous levels of emissions.

66. The Facility Manager Defendants had actual knowledge of the potentially carcinogenic qualities of EtO much earlier than the 2018 release of the 2014 NATA results because their respective roles at the facility required them to be aware of the health effects of EtO which were widely known to those in in their industry to cause cancer before 2018, because Defendants had been studying EtO for decades and were well aware of reports of its toxicity to humans, and because respected organizations had already classified the chemical as reasonably anticipated to be carcinogenic to humans even before IRAC reported in 2010 and the EPA reported in 2016 that it was "carcinogenic to humans."  The Facility Manager Defendants unquestionably knew that the EPA had concluded that EtO was a likely carcinogen, and that the facility's emissions of EtO greatly exceeded levels that would result in what the EPA considers an acceptable ambient air concentration.

67. On information and belief, each of the Facility Manager Defendants had the authority to shut down emissions of EtO from the facility and implement changes to emissions controls and systems necessary to reduce dangerous emissions of EtO, but none of the Facility Manager Defendants exercised their authority to take steps to protect the community surrounding the facility by reducing emission levels or shutting the facility down until emission levels could be lowered to safe levels.

68. Upon information and belief, Randy Cashio was employed by EMC from September of 2018 to April of 2021 as a plant manager of the facility and holds a degree in chemical engineering. Mr. Cashio was designated as a PRO for emissions of EtO from the facility in 2019 and 2020. Mr. Cashio has had direct responsibility for EtO emissions and was personally responsible for ensuring compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Cashio knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being

11

NON-CERTIFIED COPY

emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

69. Upon information and belief, James Carter was as a site manager of the facility from January of 2017 to April of 2018. Mr. Carter was designated as a PRO for emissions of EtO from the facility in 2017. Mr. Carter has had direct responsibility for EtO emissions and was personally responsible for ensuring compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Carter knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

70. Upon information and belief, Artis Williams was a site manager of the facility from at least 2014 to 2066. Mr. Williams was designated as a PRO for emissions of EtO from the facility in 2016. Mr. Williams has had direct responsibility for EtO emissions and was personally responsible for ensuring compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Williams knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

71. Upon information and belief, Kerry Harrison was a site manager of the facility who was designated as a PRO for emissions of EtO from the facility in 2008. Mr. Harrison has had direct responsibility for EtO emissions and was personally responsible for ensuring compliance with environmental regulations and laws and the permits issued by the LDEQ to the facility. Mr. Harrison knew or should have known that people living in the surrounding community were and continue to be exposed to unsafe levels of EtO being emitted from the facility and that those people faced and still face an increased risk of developing cancer as a result of the emissions of EtO from the facility.

**Defendants' continued actions continue to cause injury to Plaintiffs.**

72. The facility has continuously emitted dangerous levels of EtO that are inhaled by Plaintiffs and the tortious emission of EtO has never abated.

73. Plaintiffs continue to suffer injury as a result of the Defendants' failure to abate the dangerous emission of EtO.

NON-CERTIFIED COPY

74. Though all Plaintiffs have already developed cancer except for the three Plaintiffs who are also bringing claims on behalf of their deceased spouses, Plaintiffs have an increased risk of developing additional illnesses, including cancer, as a result of the unabated emission of dangerous levels of EtO from the facility.

75. Plaintiffs' injuries to date and risk of future health problems are both the result of continuous, indivisible, and compounding tortious activities by Defendants.

**The Plaintiffs did not reasonably know that it was the Defendants' acts and omissions described above that caused their injuries and damages until less than a year before this lawsuit was filed.**

76. As a result of the above-described acts and omissions by all of the Defendants, exposure to the unsafe levels of EtO from the facility was a substantial factor in each Plaintiff's development of cancer and is a substantial factor in development of future health problems.

77. Defendants' misrepresentations about of the carcinogenic quality of EtO impeded the Plaintiffs' ability to assert the causes of action stated herein and Defendants' actions and inactions did, in fact, delay the Plaintiffs' discovery that the cancers and risks of cancer alleged herein had been caused by exposure to EtO.

78. Although some of the Plaintiffs were diagnosed more than one year prior to the date of this Petition and some persons on whose behalf claims are brought died more than one year prior to the date of this Petition, none of the Plaintiffs knew or reasonably should have known that their cancer to date was caused by exposure to the EtO emitted by the facility before one year prior to the date of this Petition.

79. All Plaintiffs continue to be exposed to unsafe levels of EtO from the facility and face an ongoing risk of adverse effects to their health and development of additional cancer.

80. Lamar Ellis lives within 6.5 miles of the facility and Gaynell Perrilloux-Ellis lived at the same location and was diagnosed with breast cancer in 2016 and died in February of 2020. . No physician ever advised Mr. or Mrs. Ellis that Mrs. Ellis' cancer may have been caused by exposure to EtO so as to reasonably put them on notice of their cause of action against Defendants. Mr. and Mrs. Ellis did not know they were exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time Mr. or Mrs. Ellis had any reason to think that EtO emission from the facility was a substantial factor in causing Ms. Ellis' cancer was when Mr. Ellis received an advertisement in the mail from The Voorhies Law Firm on or after April

NON-CERTIFIED COPY

28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was the first indication Mr. or Mrs. Ellis had that EtO exposure may have been a substantial factor in causing Mrs. Ellis' cancer. Thereafter Mr. Ellis took reasonable steps to investigate whether exposure to EtO had caused Ms. Ellis' cancer or created a risk of future cancer for Mr. Ellis. Mr. Ellis filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

81. Larry Fortado lives within 6.2 miles of the facility and Mary Ann Fortado lived at the same location and died from breast cancer in 2018. No physician ever advised Mr. or Mrs. Fortado that Mrs. Fortado's cancer may have been caused by exposure to EtO so as to reasonably put them on notice of their cause of action against Defendants.  Mr. and Mrs. Fortado did not know they were exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time Mr. or Mrs. Fortado had any reason to think that EtO emission from the facility was a substantial factor in causing Ms. Fortado's cancer was when Mr. Fortado received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was the first indication Mr. or Mrs. Fortado had that EtO exposure may have been a substantial factor in causing Mrs. Fortado's cancer.  Thereafter Mr. Fortado took reasonable steps to investigate whether exposure to EtO had caused Ms. Fortado's cancer or created a risk of future cancer for Mr. Fortado. Mr. Fortado filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

82. Ervin Jack Jr. lives within 2.7 miles of the facility and Leander Cook Jack lived at the same location and died from breast cancer in 2000. No physician ever advised Mr. or Mrs. Jack that Mrs. Jack's cancer may have been caused by exposure to EtO so as to reasonably put them on notice of their cause of action against Defendants.  Mr. and Mrs. Jack did not know they were exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time Mr.

NON-CERTIFIED COPY

or Mrs. Jack had any reason to think that EtO emission from the facility was a substantial factor in causing Ms. Jack's cancer was when Mr. Jack received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication Mr. or Mrs. Jack had that EtO exposure may have been a substantial factor in causing Mrs. Jack's cancer. Thereafter Mr. Jack took reasonable steps to investigate whether exposure to EtO had caused Ms. Jack's cancer or created a risk of future cancer for Mr. Jack. Mr. Jack filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

83. Kathrine Foster lives within 1 mile of the facility and was diagnosed with breast cancer in 2019. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

84. Joyce Johnson lives within 1.8 miles of the facility and was diagnosed with lymphoma in January of 2020. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a

NON-CERTIFIED COPY

substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

85. Geneiva Jones lives within 1 mile of the facility and was diagnosed with breast cancer in 2016. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

86. Roslyn Joseph lives within 2.7 miles of the facility and was diagnosed with breast cancer in 2010. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies

16

NON-CERTIFIED COPY

Law Firm on or after April 28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer.  Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

87. Joan LeBeouf lives within 3 miles of the facility and was diagnosed with breast cancer in 2010. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants.  She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer.  Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

88. Loritta Lumar lives within 2.8 miles of the facility and was diagnosed with lymphoma in April of 2020. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants.  She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020.  The advertisement advised that

17

NON-CERTIFIED COPY

people living near the facility may have legal rights because of the emissions of EtO from the facility.   That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer.   Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

89. Margie Moore lives within 3.75 miles of the facility and was diagnosed with breast cancer in 2014. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants.  She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer.  Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

90. Ramona Simoneaux lives within 5 miles of the facility and was diagnosed with breast cancer in 2014. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants.  She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020.  The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility.  That was

NON-CERTIFIED COPY

the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

91. Aleshia Sylvain lives within 2.3 miles of the facility and was diagnosed with breast cancer in 2018. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

92. August Tassin, Jr. lives within 3.75 miles of the facility and was diagnosed with lymphoma in 199. No physician ever advised him that his cancer may have been caused by exposure to EtO so as to reasonably put him on notice of his cause of action against Defendants. He did not know he was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time he had any reason to think that EtO emission from the facility was a substantial factor in causing his cancer was when he received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication he had that EtO exposure may have been a substantial factor in causing his cancer.

NON-CERTIFIED COPY

Thereafter he took reasonable steps to investigate whether exposure to EtO had caused his cancer or created a risk of future cancer. He filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided him any warning about EtO emitted by the facility.

93. Ginger Villa lives within 4 miles of the facility and previously lived within 1.6 miles of the facility. Ms. Villa was diagnosed with Hodgkin's lymphoma in 2012. No physician ever advised her that her cancer may have been caused by exposure to EtO so as to reasonably put her on notice of her cause of action against Defendants. She did not know she was exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time she had any reason to think that EtO emission from the facility was a substantial factor in causing her cancer was when she received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication she had that EtO exposure may have been a substantial factor in causing her cancer. Thereafter she took reasonable steps to investigate whether exposure to EtO had caused her cancer or created a risk of future cancer. She filed this action within one year of learning facts supporting that she had a cause of action against Defendants. No one from the local, state, or federal government has directly provided her any warning about EtO emitted by the facility.

## CAUSES OF ACTION

### Count 1 – Negligence of Evonik

94. Evonik has a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

95. Evonik knows that a person's exposure to EtO in the ambient air could cause cancer and that EtO was /is being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

96. Evonik knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

97. As the operator of the facility with control over the levels of EtO released from the facility, Evonik owes a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that do not pose an unreasonable

NON-CERTIFIED COPY

risk of harm. Evonik breached that duty by, among other things, emitting EtO from facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, Evonik's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

98. Evonik's actions were both a cause in fact and legal cause of these harms.

99. The facility has at relevant times been in the custody and control of Evonik.

100. Evonik knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

101. Evonik could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. Evonik chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

102. Evonik's actions and omissions continue to cause continuous damages and harm to the Plaintiffs.

103. Evonik has been, and continues to be, negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

NON-CERTIFIED COPY

f.)  Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

g.)  Failing to know what it should have known;

h.)  Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

## Count 2 – Evonik's Liability for Civil Battery

104.  During it operation of the facility, Evonik has intended to release emissions of EtO from the facility.

105.  Evonik knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

106.  Evonik also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

107.  The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

108.  As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

109.  As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

## Count 3 – Evonik's Liability under La. C.C. arts. 667-669

110.  Evonik had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors.  Evonik is required to use their property - the facility - in such a manner as not to injure its neighbors.

111.  Plaintiffs live near the facility and were, and continue to be, continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems.  Plaintiffs all

NON-CERTIFIED COPY

live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

112. Evonik knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the Evonik had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but Evonik failed to take any steps to reduce EtO emissions and it still has not reduced EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

## Count 4 – Negligence of EMC

113. EMC had a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

114. EMC knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

115. EMC knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

116. As the operator of the facility with control over the levels of EtO released from the facility, EMC owed a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that did not pose an unreasonable risk of harm. EMC breached that duty by, among other things, emitting EtO from the facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, EMC's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

117. EMC's actions were both a cause in fact and legal cause of these harms.

118. The facility has at relevant times been in the custody and control of EMC.

119. EMC knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

NON-CERTIFIED COPY

120. EMC could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. EMC chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

121. EMC was negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

    f.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

    g.) Failing to know what it should have known;

    h.) Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

**Count 5 – EMC's Liability for Civil Battery**

122. During its operation of the facility EMC intended to release emissions of EtO from the facility.

123. EMC knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

NON-CERTIFIED COPY

124.   EMC also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

125.   The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

126.   As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

127.   As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 6 –EMC's Liability under La. C.C. arts. 667-669

128.   EMC had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors.  EMC is required to use their property - the facility - in such a manner as not to injure its neighbors.

129.   Plaintiffs live near the facility and were continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems.   Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

130.   EMC knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the EMC had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but EMC failed to take any steps to reduce EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

### Count 7 -- Negligence of APPMI

131.   APPMI had a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

NON-CERTIFIED COPY

132. APPMI knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

133. APPMI knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

134. As the operator of the facility with control over the levels of EtO released from the facility, APPMI owed a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that did not pose an unreasonable risk of harm. APPMI breached that duty by, among other things, emitting EtO from the facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, APPMI's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

135. APPMI's actions were both a cause in fact and legal cause of these harms.

136. The facility has at relevant times been in the custody and control of APPMI.

137. APPMI knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

138. APPMI could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. APPMI chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

139. APPMI was negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

NON-CERTIFIED COPY

d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

f.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

g.) Failing to know what it should have known;

h.) Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

### Count 8 – APPMI's Liability for Civil Battery

140. During its operation of the facility APPMI intended to release emissions of EtO from the facility.

141. APPMI knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

142. APPMI also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

143. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

144. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

145. As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

NON-CERTIFIED COPY

## Count 9 –APPMI's Liability under La. C.C. arts. 667-669

146. APPMI had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. APPMI is required to use their property - the facility - in such a manner as not to injure its neighbors.

147. Plaintiffs live near the facility and were continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems. Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

148. APPMI knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the APPMI had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but AAPMI failed to take any steps to reduce EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

## Count 10 – Negligence of VERSUM

149. VERSUM had a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

150. VERSUM knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

151. VERSUM knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

152. As the operator of the facility with control over the levels of EtO released from the facility, VERSUM owed a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that did not pose an unreasonable risk of harm. VERSUM breached that duty by, among other things, emitting EtO from the facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore,

NON-CERTIFIED COPY

VERSUM's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

153. VERSUM's actions were both a cause in fact and legal cause of these harms.

154. The facility has at relevant times been in the custody and control of VERSUM.

155. VERSUM knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

156. VERSUM could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. VERSUM chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

157. VERSUM was negligent in the following non-exclusive ways:

    a.)    Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.)    Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.)    Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.)    Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.)    Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

    f.)    Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

    g.)    Failing to know what it should have known;

    h.)    Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

NON-CERTIFIED COPY

**Count 11 – VERSUM's Liability for Civil Battery**

158. During its operation of the facility VERSUM intended to release emissions of EtO from the facility.

159. VERSUM knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

160. VERSUM also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

161. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

162. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

163. As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

**Count 12 –VERSUM's Liability under La. C.C. arts. 667-669**

164. VERSUM had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. VERSUM is required to use their property - the facility - in such a manner as not to injure its neighbors.

165. Plaintiffs live near the facility and were continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems. Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

166. VERSUM knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the VERSUM had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but VERSUM failed to take any steps to reduce EtO

NON-CERTIFIED COPY

emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

## Count 13 – Negligence of TOMAH

167. TOMAH had a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

168. TOMAH knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

169. TOMAH knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

170. As the operator of the facility with control over the levels of EtO released from the facility, TOMAH owed a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that did not pose an unreasonable risk of harm. TOMAH breached that duty by, among other things, emitting EtO from the facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, TOMAH's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

171. TOMAH's actions were both a cause in fact and legal cause of these harms.

172. The facility has at relevant times been in the custody and control of TOMAH.

173. TOMAH knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

174. TOMAH could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. TOMAH chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

175. TOMAH was negligent in the following non-exclusive ways:

    a.)    Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

NON-CERTIFIED COPY

b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

f.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

g.) Failing to know what it should have known;

h.) Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

### Count 14 – TOMAH's Liability for Civil Battery

176. During its operation of the facility TOMAH intended to release emissions of EtO from the facility.

177. TOMAH knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

178. TOMAH also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

179. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

180. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

NON-CERTIFIED COPY

181. As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 15 – TOMAH's Liability under La. C.C. arts. 667-669

182. TOMAH had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. TOMAH is required to use their property - the facility - in such a manner as not to injure its neighbors.

183. Plaintiffs live near the facility and were continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems. Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

184. TOMAH knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the EMC had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but TOMAH failed to take any steps to reduce EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

### Count 16 – Negligence of SHELL

185. SHELL had a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

186. SHELL knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO was being emitted from the facility into the ambient air around the facility in levels that far exceeded what the EPA would consider acceptable.

187. SHELL knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

188. As the operator of the facility with control over the levels of EtO released from the facility, SHELL owed a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that did not pose an unreasonable risk of harm. SHELL breached that duty by, among other things, emitting EtO

NON-CERTIFIED COPY

from the facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including the Plaintiffs. Furthermore, SHELL's actions actually caused harm to persons located in the surrounding areas, including the harms suffered by the Plaintiffs.

189. SHELL's actions were both a cause in fact and legal cause of these harms.

190. The facility has at relevant times been in the custody and control of SHELL.

191. SHELL knew or should have known that the emission EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs.

192. SHELL could have prevented the harms suffered by the Plaintiffs through the exercise of reasonable care, namely by reducing or eliminating the emission of EtO from the facility. SHELL chose not to exercise such reasonable care, and its failure is both a cause in fact and legal cause of Plaintiff's damages.

193. SHELL was negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

    c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level;

    d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

    e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

    f.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiffs to dangerous levels of EtO;

    g.) Failing to know what it should have known;

NON-CERTIFIED COPY

h.)    Misleading the Plaintiffs and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

### Count 17 – SHELL's Liability for Civil Battery

194. During its operation of the facility SHELL intended to release emissions of EtO from the facility.

195. SHELL knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

196. SHELL also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

197. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

198. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

199. As a direct and proximate result of their nonconsensual inhalation of Union Carbide's and/or Dow's intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 18 –SHELL's Liability under La. C.C. arts. 667-669

200. SHELL had a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors.  SHELL is required to use their property - the facility - in such a manner as not to injure its neighbors.

201. Plaintiffs live near the facility and were continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Plaintiffs' respective cancers and Plaintiff's risk of further health problems.  Plaintiffs all live or have lived in close proximity to the facility and have been and continued to be damaged by their exposure to the dangerous emissions released by the facility.

202. SHELL knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility,

NON-CERTIFIED COPY

including these Plaintiffs. The damages caused to these Plaintiffs could have been prevented if the SHELL had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but SHELL failed to take any steps to reduce EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

### Count 19- Negligence of James Carter

203. Mr. Carter, in connection with designation as a PRO, was specifically delegated duties owed by one or more of the corporations defendants to Plaintiffs.

204. Mr. Carter failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

205. Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Carter caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

206. Mr. Carter has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

207. Mr. Carter's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; his acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

### Count 20 – Civil Battery by James Carter

208. At all relevant times, Mr. Carter intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

209. Mr. Carter knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

NON-CERTIFIED COPY

210.  Mr. Carter also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

211.  The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

212.  As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

213.  As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

214.

## Count 21- Negligence of Artis Williams

215.  Mr. Williams, in connection with designation as a PRO, was specifically delegated duties owed by one or more of the corporations defendants to Plaintiffs.

216.  Mr. Williams failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

217.  Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Williams caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

218.  Mr. Williams has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

NON-CERTIFIED COPY

219. Mr. Williams's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; his acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

## Count 22 – Civil Battery by Artis Williams

220. At all relevant times, Mr. Williams intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

221. Mr. Williams knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

222. Mr. Williams also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

223. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

224. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

225. As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

## Count 23- Negligence of Randy Cashio

226. Mr. Cashio, in connection with designation as a PRO, was specifically delegated duties owed by one or more of the corporations defendants to Plaintiffs.

227. Mr. Cashio failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

228. Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's

NON-CERTIFIED COPY

neighbors as to the health risks the facility created by EtO, Mr. Cashio caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

229. Mr. Cashio has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

230. Mr. Cashio's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; his acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

### Count 24 – Civil Battery by Randy Cashio

231. At all relevant times, Mr. Cashio intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

232. Mr. Cashio knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

233. Mr. Cashio also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

234. The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

235. As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

236. As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

### Count 25- Negligence of Kerry Harrison

237. Mr. Harrison, in connection with designation as a PRO, was specifically delegated duties owed by one or more of the corporations defendants to Plaintiffs.

238. Mr. Harrison failed to exercise reasonable care and breached duties to Plaintiffs by allowing the facility to continue to emit EtO, in amounts that created an unreasonable and

NON-CERTIFIED COPY

foreseeable risk of harm to persons located in the surrounding areas, including the Plaintiffs, and by allowing permit violations, which, on information and belief, contributed to the unsafe levels of EtO in the ambient air, despite his own personal knowledge of the health risks and increased risk of cancer posed by the high level of emissions.

239.  Instead of taking steps that he had the personal ability to take to implement designs or systems that would reduce the levels of dangerous emissions of EtO and warn the facility's neighbors as to the health risks the facility created by EtO, Mr. Harrison caused Plaintiffs to be exposed to dangerous levels of EtO from the facility.

240.  Mr. Harrison has had actual knowledge of the risk to Plaintiffs as a result of the emission of EtO from the facility and breached the duty owed to Plaintiffs that was delegated to him, which could not be further delegated to subordinates by state regulations, by exposing Plaintiffs to unsafe amounts of EtO.

Mr. Harrison's breach of the personal duty to Plaintiffs is a specific cause of Plaintiffs' damages; his acts and omissions were and continue to be a significant contributing cause of the Plaintiffs' harms.

**Count 26 – Civil Battery by Kerry Harrison**

241.  At all relevant times, Mr. Harrison intended for the facility to release emissions of EtO and was personally responsible for those intended emissions.

242.  Mr. Harrison knew that the intended emissions of EtO from the facility would make contact with and be inhaled by the individuals living in close proximity to the facility, which included Plaintiffs.

243.  Mr. Harrison also knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals living in close proximity to the facility who inhaled the chemical.

244.  The Plaintiffs did not know that they were inhaling EtO until within the last year and thus had never consented to making contact with or inhaling the chemical; nor do they consent to inhaling EtO today.

245.  As a direct and proximate result of the facility's emissions of EtO, Plaintiffs were contacted by and inhaled dangerous levels of EtO without their consent.

NON-CERTIFIED COPY

246.  As a direct and proximate result of their nonconsensual inhalation of the intended emissions of EtO from the facility, Plaintiffs developed cancer and have an increased risk of further serious health risks and medical conditions.

## DAMAGES

247.  Because of the aforementioned intentional misconduct and negligence of defendants, Plaintiffs have suffered severe and disabling injuries, for which they seek the following damages:

    a.) Past, present, and future pain and suffering;

    b.) Past, present, and future medical expenses;

    c.) Permanent and/or partial physical disability and/or impairment;

    d.) Scarring and disfigurement;

    e.) Past, present, and future loss of enjoyment of life;

    f.) Future loss of income;

    g.) Future loss of earning capacity;

    h.) The fear and increased likelihood of development of cancer and other fatal and debilitating diseases;

    i.) The fear and increased likelihood of development of damage to vital organs, reproductive system and central nervous system

    j.) The fear of early death.

248.  In addition, Lamar Ellis has suffered from the wrongful death of his wife and is additionally entitled to recover for his wife's pain and suffering before her death.

249.  In addition, Ervin Jack Jr. has suffered from the wrongful death of his wife and is additionally entitled to recover for his wife's pain and suffering before her death.

250.  In addition, Leroy Fortado has suffered from the wrongful death of his wife and is additionally entitled to recover for his wife's pain and suffering before her death.

251.  Plaintiffs prays for a trial by jury.

252.  Wrongful death and survival damages.

WHEREFORE, Plaintiffs pray that, after due proceedings had, there be judgment herein in favor of Plaintiffs and against Defendants for such damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid; for all costs of this proceeding; and for all other general and equitable relief to which they are entitled.

41

NON-CERTIFIED COPY

Respectfully Submitted:

RICHARD P. VOORHIES III (#30782)
WILLIAM A. BAROUSSE (#29748)
THE VOORHIES LAW FIRM
1100 Poydras Street
Energy Center, Suite 2810
New Orleans, LA 70163
Phone:  504-875-2223
Fax:  504-875-4882
Email: richard@voorhieslaw.com
Email: william@voorhieslaw.com

-and-

JENNIFER THORNTON (#27109)
WILLIAM M. ROSS (#27064)
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Phone:  504-523-1580
Fax:  504-524-0069

PLEASE SERVE:

AIR PRODUCTS PERFORMANCE MANUFACTURING, INC.
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

EVONIK CORPORATION
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

EVONIK MATERIALS CORPORATION
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

VERSUM MATERIALS PERFORMANCE MANUFACTURING, INC.
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

TOMAH RESERVE, INC,
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA 70802

NON-CERTIFIED COPY

SHELL OIL COMPANY
THROUGH ITS AGENT FOR SERVICE OF PROCESS
CT CORPORATION SYSTEM
3867 PLAZA TOWER DR.
BATON ROUGE, LA 70816

RANDY CASHIO
2519 N NOBILE ST,
PAULINA, LA 70763-2525

JAMES D CARTER
320 WILLOWDALE BLVD.
 LULING, LA 70070-3050

ARTIS R WILLIAMS
15327 ARIANA AVE.
 PRAIRIEVILLE, LA 70769

 KERRY HARRISON
106 CADOW ST,
PARADIS, LA 70080-2432

NON-CERTIFIED COPY

4-28-21 @ 11:48:12

# RETURN

## D55635759
D55635759

## CITATION

| | |
|---|---|
| LAMAR ELLIS, ET. AL. | 40TH JUDICIAL DISTRICT COURT |
| VS | PARISH OF ST.JOHN THE BAPTIST |
| EVONIK CORPORATION, ET. AL. | STATE OF LOUISIANA |
| DOCKET NUMBER: C-76717 | DIVISION: C |

To: KERRY HARRISON
106 CADOW STREET
PARADIS, LA 70080-2432

Parish: ST. CHARLES

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*ANDRENESE L.M. THOMAS*
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _28_ DAY OF _April_ , 20 _21_ AND ON THE _28_ DAY OF _April_ , 20 _21_ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _Kerry Harrison_

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _ST Charles_ THIS _29_ DAY OF _April_ , 20 _21_.

| | |
|---|---|
| SERVICE $_____ | BY: _Marvin Rose_ |
| MILEAGE $_____ | DEPUTY SHERIFF |
| TOTAL $_____ | |

ORIGINAL – RETURN       COPY – SERVICE       COPY - CLERK

Eliana DeFrancesch - Clerk of Court
Filed: May 03, 2021 1:22 PM

134390996

2021 APR 28 AM 10:40
RECEIVED
ST. CHARLES PARISH
SHERIFF'S OFFICE

NON-CERTIFIED COPY

NON-CERTIFIED COPY

40TH JUDICIAL DISTRICT COURT
ST. JOHN THE BAPTIST PARISH
P.O. BOX 280
EDGARD, LOUISIANA 70049-0280

D55635783

D55635783

# CITATION

| LAMAR ELLIS, ET. AL. | 40TH JUDICIAL DISTRICT COURT |
| VS. | PARISH OF ST.JOHN THE BAPTIST |
| EVONIK CORPORATION, ET. AL. | STATE OF LOUISIANA |
| DOCKET NUMBER: C-76717 | DIVISION: C |

**To:** **RANDY CASHIO**
**2519 N. NOBILE STREET**
**PAULINA, LA 70763-2525**

Parish: ST. JAMES

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen **(15)** days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese LM Thomas*

**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE __29__ DAY OF __April__, 20 __21__ AND ON THE __29__ DAY OF __April__, 20 __21__ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _____ THIS __5r__ DAY OF __April__, 20 __21__.

SERVICE $ _____      BY: _____
MILEAGE $ _____           DEPUTY SHERIFF
TOTAL   $ _____

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

Eliana DeFrancesch - Clerk of Court
Filed: May 05, 2021 1:10 PM
134392760

RECEIVED BY
ST. JAMES PARISH
SHERIFF'S OFFICE
2021 APR 29 AM 11: 47

NON-CERTIFIED COPY

D55635734

D55635734

# CITATION

**LAMAR ELLIS, ET. AL.**

VS

**EVONIK CORPORATION, ET. AL.**

**DOCKET NUMBER: C-76717**

**40TH JUDICIAL DISTRICT COURT**

**PARISH OF ST.JOHN THE BAPTIST**

**STATE OF LOUISIANA**

**DIVISION: C**

To:     **EVONIK CORPORATION**
        **THROUGH CORPORTATION SERVICE COMPANY**
        **501 LOUISIANA AVENUE**
        **BATON ROUGE, LA     70802**

**Parish: EAST BATON ROUGE**

*I made service on the named party through the CORPORATION SERVICE COMPANY*

MAY 05 2021

*by tendering a copy of this document to:*

EMMA WALLACE

☐ CUMMINS #1155

BY: Sheriff East Baton Rouge, LA.

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

\* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese LM Thomas*

**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20_____ AND ON THE _____ DAY OF _____, 20_____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____.

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF _____, 20_____.

SERVICE  $_____          BY:_____
MILEAGE $_____                    DEPUTY SHERIFF
TOTAL    $_____

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

NON-CERTIFIED COPY

134399591

Filed: May 10, 2021  1:10 PM





NON-CERTIFIED COPY

D55635734

D55635734

# CITATION

| LAMAR ELLIS, ET. AL. | 40TH JUDICIAL DISTRICT COURT |
|---|---|
| VS | PARISH OF ST.JOHN THE BAPTIST |
| EVONIK CORPORATION, ET. AL. | STATE OF LOUISIANA |
| DOCKET NUMBER: C-76717 | DIVISION: C |

**To:   EVONIK CORPORATION**
**THROUGH CORPORTATION SERVICE COMPANY**
**501 LOUISIANA AVENUE**
**BATON ROUGE, LA    70802**

*made service on the named party through the CORPORATION SERVICE COMPANY*

*EMMA WALLACE*

MAY 0 5 2021

*by tendering a copy of this document*

*BY E. CUMMINS #1155*
*Deputy*
*Parish of East Baton Rouge, LA*

**Parish: EAST BATON ROUGE**

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

\* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese L.M. Thomas*
**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20 _____ AND ON THE _____ DAY OF
_____, 20 _____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED. _____.

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS
DOMICILE IN THE PARISH IN THE HANDS OF _____, A
PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN
SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I
LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT
FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF
_____, 20 _____.

| SERVICE $_____ | BY:_____ |
|---|---|
| MILEAGE $_____ | DEPUTY SHERIFF |
| TOTAL    $_____ | |

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

*Eliana DeFrancesch - Clerk of Court*
*Filed: May 10, 2021 1:10 PM*
134399609



NON-CERTIFIED COPY





NON-CERTIFIED COPY

D55635767

D55635767

## CITATION

| | |
|---|---|
| **LAMAR  ELLIS, ET. AL.** | **40TH JUDICIAL DISTRICT COURT** |
| **VS** | **PARISH OF ST.JOHN THE BAPTIST** |
| **EVONIK CORPORATION, ET. AL.** | **STATE OF LOUISIANA** |
| **DOCKET NUMBER: C-76717** | **DIVISION: C** |

**To:**   **AIR PRODUCTS PERFORMANCE MANUFACTURING, INC**
**THROUGH CORPORTATION SERVICE COMPANY**
**501 LOUISIANA AVE**
**BATON ROUGE, LA   70802**

**Parish: EAST BATON ROUGE**

You are hereby summoned to comply with the demand contained in the Petition of which
a true and correct copy accompanies this citation, or make an appearance, either by filing
an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and
for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the
service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by
the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese L.M. Thomas*
***ANDRENESE L.M. THOMAS***
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20_____ AND ON THE _____DAY OF
_____, 20_____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS
DOMICILE IN THE PARISH IN THE HANDS OF _____, A
PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN
SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I
LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT
FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF
_____, 20_____.

SERVICE  $_____          BY:_____
MILEAGE $_____                     DEPUTY SHERIFF
TOTAL    $_____

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

*(stamp, rotated:)* I made service through the within named through the Corporation Service Company CORPORATION SERVICE COMPANY EMMA WALLACE MAY 0 5 2021 by tendering a copy of this document CUMMINS #1155 Baton Rouge, LA East Baton Rouge Deputy

*(left margin, rotated:)* Eliana DeFrancesch - Clerk of Court
Filed: May 10, 2021 1:10 PM
134399617

NON-CERTIFIED COPY





NON-CERTIFIED COPY

D55635791

D55635791

## CITATION

| | |
|---|---|
| **LAMAR ELLIS, ET. AL.** | **40TH JUDICIAL DISTRICT COURT** |
| **VS** | **PARISH OF ST.JOHN THE BAPTIST** |
| **EVONIK CORPORATION, ET. AL.** | **STATE OF LOUISIANA** |
| **DOCKET NUMBER: C-76717** | **DIVISION: C** |

To:   **TOMAH RESERVE, INC.**
      **THROUGH CORPORTATION SERVICE COMPANY**
      **501 LOUISIANA AVE**
      **BATON ROUGE, LA      70802**

**Parish: EAST BATON ROUGE**

*[stamp overlay: served on the named party through the CORPORATION SERVICE COMPANY MAY 05 2021 by tendering a copy of this document to: ☐ CUMMINS #1155 East Baton Rouge, LA Parish Deputy ELIANA WALLACE]*

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese L.M. Thomas*

**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20_____ AND ON THE _____ DAY OF
_____, 20_____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____.

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF
_____, 20_____.

SERVICE  $_____          BY:_____
MILEAGE $_____                        DEPUTY SHERIFF
TOTAL     $_____

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

*[left margin, rotated]* Eliana DeFrancesch - Clerk of Court
Filed: May 10, 2021 1:10 PM
134399625

NON-CERTIFIED COPY



RECEIVED

MAY 0 4 2021

E.B.R. Sheriff Office

NON-CERTIFIED COPY

D55635809
D55635809

## CITATION

| | |
|---|---|
| LAMAR ELLIS, ET. AL. | 40TH JUDICIAL DISTRICT COURT |
| VS | PARISH OF ST. JOHN THE BAPTIST |
| EVONIK CORPORATION, ET. AL. | STATE OF LOUISIANA |
| DOCKET NUMBER: C-76717 | DIVISION: C |

**To:** VERSUM MATERIALS PERFORMANCE MANUFACTURING, INC.
THROUGH CORPORTATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA  70802

**Parish:** EAST BATON ROUGE

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese L.M. Thomas*
**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20 ____ AND ON THE _____ DAY OF _____, 20 ____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____.

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF _____, 20 ____.

| | |
|---|---|
| SERVICE  $ _____ | BY: _____ |
| MILEAGE $ _____ | DEPUTY SHERIFF |
| TOTAL   $ _____ | |

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

Eliana DeFrancesch - Clerk of Court
Filed: May 10, 2021  1:10 PM
134399633

NON-CERTIFIED COPY





NON-CERTIFIED COPY



D55635726

D55635726

# CITATION

| | |
|---|---|
| **LAMAR ELLIS, ET. AL.** | **40TH JUDICIAL DISTRICT COURT** |
| **VS** | **PARISH OF ST.JOHN THE BAPTIST** |
| **EVONIK CORPORATION, ET. AL.** | **STATE OF LOUISIANA** |
| **DOCKET NUMBER: C-76717** | **DIVISION: C** |

**To:**  **SHELL OIL COMPANY**
**THROUGH CT. CORPORATION SYSTEM** *Made service on the named party through the*
**3867 PLAZA TOWER DR.** *CT Corporation*
**BATON ROUGE, LA   70816**   MAY 05 2021

*by tendering a copy of this document to*
**Parish: EAST BATON ROUGE**   *Ashley Minvielle*

E. CUMMINS

*Parish of East Baton Rouge, Louisiana*

You are hereby summoned to comply with the demand contained in the Petition of which
a true and correct copy accompanies this citation, or make an appearance either by filing
an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and
for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the
service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by
the Clerk of Court on the **APRIL 26, 2021.**

\* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese L.M. Thomas*
***ANDRENESE L.M. THOMAS***
Deputy Clerk of Court for
Eliana DeFranceschi, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20_____ AND ON THE _____ DAY OF
_____, 20_____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____.

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS
DOMICILE IN THE PARISH IN THE HANDS OF _____, A
PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN
SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I
LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT
FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED:  PARISH OF _____ THIS _____ DAY OF
_____, 20_____.

SERVICE  $_____   BY:_____
MILEAGE $_____   DEPUTY SHERIFF
TOTAL   $_____

ORIGINAL – RETURN    COPY – SERVICE    COPY - CLERK



Eliana DeFranceschi - Clerk of Court
Filed: May 10, 2021  1:10 PM
134399641

NON-CERTIFIED COPY





NON-CERTIFIED COPY

**RETURN**

D55635775

D55635775

*Handwritten notes in top left margin:*
Wrong Address No
forwarding Address
This is son James
Derik Carter that lives
The James that lives
at this address 14.29
is the father

## CITATION

| LAMAR ELLIS, ET. AL. | 40TH JUDICIAL DISTRICT COURT |
|---|---|
| VS | PARISH OF ST.JOHN THE BAPTIST |
| EVONIK CORPORATION, ET. AL. | STATE OF LOUISIANA |
| DOCKET NUMBER: C-76717 | DIVISION: C |

To:    JAMES D. CARTER
       320 WILLOWDALE BLVD
       LULING, LA 70070-3050

**Parish: ST. CHARLES**

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

*Andrenese LM Thomas*

**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _____ DAY OF _____, 20____ AND ON THE _____ DAY OF _____, 20____ SERVED THE ABOVE NAMED PARTY AS FOLLOWS: _____

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _____, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _____ THIS _____ DAY OF _____, 20____.

| SERVICE $ _____ | BY: _____ |
|---|---|
| MILEAGE $ _____ | DEPUTY SHERIFF |
| TOTAL    $ _____ | |

ORIGINAL – RETURN          COPY – SERVICE          COPY - CLERK

*Left margin:* Eliana DeFrancesch – Clerk of Court
Filed: May 17, 2021 1:50 PM
134414333

*Right margin:* 2021 APR 28  AM 10: 39
RECEIVED
ST. CHARLES PARISH
SHERIFF'S OFFICE

NON-CERTIFIED COPY



Date 5/11/21

**RETURNED TO SHERIFF'S OFFICE NOT SERVER**

REMARKS Unable to serve, wrong address as well as wrong person. Person named on Paper work is Father. Son's middle name is Derick

BY [illegible signature]

ST. CHARLES PARISH SHERIFF'S OFFICE

14:29

NON-CERTIFIED COPY

*48-C76717 #1 CS*

# D55635817

D55635817

## CITATION

**LAMAR ELLIS, ET. AL.**                    **40TH JUDICIAL DISTRICT COURT**

**VS**                                      **PARISH OF ST.JOHN THE BAPTIST**

**EVONIK CORPORATION, ET. AL.**             **STATE OF LOUISIANA**

**DOCKET NUMBER: C-76717**                  **DIVISION: C**

**To:**   **ARTIS R. WILLIAMS**
          **15327 ARIANA AVE.**
          **PRAIRIEVILLE, LA 70769**

Parish: _Ascension Parish_

You are hereby summoned to comply with the demand contained in the Petition of which a true and correct copy accompanies this citation, or make an appearance either by filing an Answer or other pleading to said Petition, in the Fortieth Judicial District Court in and for the Parish of St. John the Baptist, State of Louisiana, within fifteen (15) days after the service hereof, under penalty of default.

This service was ordered by **RICHARD P. VOORHIES, III, ESQ.** and was issued by the Clerk of Court on the **APRIL 26, 2021.**

* Also attached are the following documents:
**PETITION FOR DAMAGES AND REQUEST FOR TRIAL BY JURY**

_Andrenese L. M. Thomas_
**ANDRENESE L.M. THOMAS**
Deputy Clerk of Court for
Eliana DeFrancesch, Clerk of Court

RECEIVED ON THE _13_ DAY OF _May_, 20 _21_ AND ON THE _13_ DAY OF _May 7:42 Am_, 20 _21_ SERVED THE ABOVE NAMED PARTY AS FOLLOWS:

PERSONAL SERVICE ON THE PARTY HEREIN NAMED _____

DOMICILIARY SERVICE ON THE PARTY HEREIN NAMED BY LEAVING THE SAME AT HIS DOMICILE IN THE PARISH IN THE HANDS OF _Kari Williams_, A PERSON APPARENTLY OVER THE AGE OF SEVENTEEN YEARS, LIVING AND RESIDED IN SAID DOMICILE AND WHOSE NAME AND OTHER FACTS CONNECTED WITH THIS SERVICE, I LEARNED BY INTERROGATING THE SAID PERSON, SAID PARTY HEREIN BEING ABSENT FROM HIS RESIDENCE AT THE TIME OF SAID SERVICE.

RETURNED: PARISH OF _Ascension_ THIS _13_ DAY OF _May_, 20 _21_.

SERVICE $_____          BY: _Rex Wiley #2572_
MILEAGE $_____              DEPUTY SHERIFF
TOTAL    $_____

ORIGINAL – RETURN          COPY – SE

(48)C76717 - 1.00
Served DOM on
ARTIS R. WILLIAMS at
15327 Ariana Av, PRAIRIEVILLE
Service Date & Time: 5/13/2021  7:42:00AM
ON KARI WILLIAMS

2572 - SSGT REX WILEY, Ascension Parish
Deputy

INT: ___

Eliana DeFrancesch - Clerk of Court
Filed: May 24, 2021 11:21 AM
134428598

2021 APR 29 AM 10: 58

NON-CERTIFIED COPY