UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAMAR ELLIS, ET AL.                              CIVIL ACTION

VERSUS                                             NO. 21-1089

EVONIK CORPORATION, ET AL.              SECTION "R" (3)

## <u>ORDER AND REASONS</u>

Before the Court are defendants Shell Oil Company's ("Shell")[1] and Evonik Corporation's ("Evonik")[2] motions to dismiss plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Plaintiffs oppose both motions.[3]

For the following reasons, the Court grants Shell's motion, and grants in part, and denies in part, Evonik's motion. The Court further severs this case into fourteen distinct civil actions, each with one plaintiff. Plaintiff Lamar Ellis's case shall remain assigned to Section R, and the thirteen severed cases shall be randomly allotted to other sections of this court. The Court grants all plaintiffs fourteen (14) days from the creation of the new civil actions to file amended complaints in each, consistent with this order's selective grants of leave to amend.

---

[1]    R. Doc. 33.
[2]    R. Doc. 35.
[3]    R. Docs. 37 & 38.

## I.      BACKGROUND

This case arises out of alleged exposure to ethylene oxide ("EtO") near a petrochemical plant in Reserve, Louisiana (the "facility"), owned and operated by defendants Evonik and Shell.[4]  Shell owned and operated the facility from 1991 until 1999,[5] and Evonik has owned and operated the facility since that time.[6]  Plaintiffs are fourteen Louisiana residents who live within seven miles of the facility,[7] and who have either contracted cancer, or had a spouse die from cancer, allegedly because of unknowing exposure to dangerous levels of EtO emitted by the facility.[8]

On April 26, 2021, plaintiffs filed suit in the Civil District Court for the Parish of St. John the Baptist, alleging that inhalation of EtO emitted from the facility was a substantial factor in causing plaintiffs' cancer, or their spouses' cancer.[9]  In their complaint, plaintiffs named as defendants Evonik

---

[4]      R. Doc. 1-1 ¶ 1.
[5]      *Id.* ¶ 31.
[6]      *Id.* ¶¶ 26-30.
[7]      *Id.* ¶¶ 12-25, 80-93.
[8]      *Id.* ¶¶ 1, 7-8.
[9]      *Id.* ¶¶ 1-9.

and Shell,[10] as well as four non-diverse employee defendants.[11]  As to Evonik and Shell, plaintiffs allege claims of negligence, civil battery, and nuisance.[12]

On June 4, 2021, Evonik removed the case to federal court, contending that the non-diverse employee defendants were improperly joined, and that, therefore, this Court has diversity jurisdiction under 28 U.S.C. § 1332.[13]  On October 19, 2021, the Court denied plaintiffs' motion to remand the case, and dismissed plaintiffs' claims against the improperly joined employee defendants.[14]

On November 5, and 9, 2021, respectively, defendants Shell and Evonik filed motions to dismiss plaintiffs' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[15]  Both movants contend that plaintiffs' claims against them are time-barred, because suit was filed after the termination of plaintiffs' one-year prescriptive period.  They further assert

---

[10]   *Id.* ¶¶ 26, 31.  In their complaint, plaintiffs named other corporate entities, including Evonik Materials Corporation, Versum Materials Performance Manufacturing, Inc., Air Products Performance Manufacturing, Inc., and Tomah Reserve, Inc.  *Id.* ¶¶ 27-30. Defendants represent, and plaintiffs do not dispute, that Evonik Corporation is the successor in interest of those entities. R. Doc. 1 ¶¶ 5-6; R. Doc. 19-1 at 1 n.1.  Accordingly, the only corporate defendants in this matter are Evonik Corporation and Shell Oil Company.

[11]   R. Doc. 1-1 ¶¶ 32-35.

[12]   *Id.* ¶¶ 94-103, 185-193, 104-109, 194-199, 105-106, 195-196.

[13]   R. Doc. 1 ¶¶ 20-37.

[14]   R. Doc. 28.

[15]   R. Docs. 33 & 35.

that the claims must be dismissed on the merits, because plaintiffs have not stated a claim for negligence, battery, or nuisance, under Louisiana law.

Plaintiffs oppose both motions, contending that their claims are not time-barred, because (1) the prescriptive period was suspended under the doctrine of *contra non valentem*, and because (2) they allege continuing torts. Plaintiffs also argue that their complaint sufficiently states claims for negligence, battery, and nuisance.

The Court considers the parties' arguments below.


## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d

228, 239, 244 (5th Cir. 2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

On a Rule 12(b)(6) motion, the Court must limit its review to the contents of the pleadings, including attachments.  *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  The Court may also consider documents attached to a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims.  *Id.*  "In addition to facts alleged in the pleadings, however, the district court 'may also consider matters of which [it] may take judicial notice.'"  *Hall v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).


## III.   DISCUSSION

### A.     Exposures Postdating Shell's Operation of the Facility

As a preliminary matter, the Court notes that two plaintiffs, Lamar Ellis and Ginger Villa, allege EtO exposure from the facility starting in 2005.[16]  It is undisputed that defendant Shell ceased operations of the facility in 1999, before the dates of these exposures.  These plaintiffs cannot hold Shell liable

---

[16]    R. Doc. 1-1 ¶¶ 12, 25.

for exposures and injuries not attributable to it.  Accordingly, all claims against Shell brought by Lamar Ellis, on his own behalf and on behalf of his deceased wife, as well as Ginger Villa, must be dismissed with prejudice. Plaintiffs do not oppose these dismissals,[17] and Shell's motion to dismiss is granted in this respect.

Shell also seeks dismissal of the claims of plaintiff Margie Moore, who alleges exposure from the facility at her home "where she has lived for decades."[18]  Because this timeframe is nonspecific and may have commenced only after Shell ceased operations at the facility, the Court dismisses all of Moore's claims against Shell.  In their opposition memorandum, plaintiffs state that Moore lived in the area since at least the 1990s.[19]  In light of this contention, the Court grants plaintiffs leave to amend the complaint for the purpose of alleging the date when Moore began to be exposed to EtO emissions from the facility.

All other alleged exposures span both Shell's and Evonik's operations of the facility.  The Court thus proceeds to address those claims as to both defendants, as well as the claims of Ellis, Villa, and Moore, as to Evonik only.

---

[17]   R. Doc. 37 at 1.

[18]   R. Doc. 1-1 ¶ 21.

[19]   R. Doc. 37 at 2 n.2.

## B.   Prescription

Both Shell and Evonik contend that some, or all, of plaintiffs' claims are time-barred because this suit was filed after expiration of the one-year prescriptive period for delictual actions under Louisiana law.  Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year."  La. Civ. Code art. 3492.  This period "commences to run from the day injury or damage is sustained."  *Id.*; *see also Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting La. Civ. Code art. 3492).  "Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action."  *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993) (citing *McCray v. N.E. Ins. Co.*, 579 So. 2d 1156 (La. App. 2 Cir. 1991)).  Similarly, survival and wrongful-death actions are subject to a prescriptive period of one year from the date of death.  La. Civ. Code art. 2315.1(A) (governing survival actions); La. Civ. Code art. 2315.2(B) (governing wrongful-death actions).

Here, plaintiffs' complaint identifies the date of cancer diagnosis and/or death corresponding to each plaintiff.  The latest such date is April 6, 2020.[20]  Plaintiffs filed this suit in state court on April 26, 2021, over one

---

[20]    R. Doc. 1-1 ¶ 20.

year after that date. [21]   Accordingly, unless the one-year period was suspended or another exception applies, all plaintiffs' claims are prescribed. Plaintiffs do not dispute this proposition.

### 1.   *Contra non valentem*

Instead, plaintiffs assert that the prescriptive period was suspended under the doctrine of *contra non valentem*.  Under Louisiana law, *contra non valentem* is a doctrine that tolls the statute of limitations, and is thus "an exception to the general rules of prescription."  *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994).  This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant.  *Renfroe v. State ex rel. Dept. of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002).

But this exception, sometimes known as the "discovery rule," is available only in "exceptional circumstances."  *Meggs v. Davis Mortuary Serv., Inc.*, 301 So. 3d 1208, 1213 (La. App. 5 Cir. 2020) (quoting *Renfroe*, 809 So. 2d at 953).  Courts assessing the applicability of *contra non valentem* must focus on the reasonableness of the tort victim's action or inaction.  *See*

---

[21]   *Id.* at 1.

*Griffin v. Kinberger*, 507 So. 2d 821, 824 n.2 (La. 1987).  As the Louisiana Supreme Court has explained:

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that damage.  *On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.*

*Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (emphasis added).

The law is clear that the prescriptive period begins to run once a party has "constructive knowledge . . . of the facts that would entitle him to bring a suit," even if he does not have actual knowledge of those facts.  *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002).   "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry."  *Id.* at 510-11.  "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription."  *Id.* at 511 (citations omitted); *see also Meggs*, 301 So. 3d at 1213 ("If the plaintiff could have discovered the cause of action by exercising reasonable diligence, the doctrine will not prevent the running of prescription." (citations omitted)); *Miles v. MEMC Pasadena, Inc.*, No. 08-4436, 2009 WL 1323014, at *3 (E.D.

La. May 8, 2009) ("The plaintiff must show that the cause of action for his injuries was not reasonably knowable. This is a heavy burden."). The discovery rule provides that, for prescription to run, a plaintiff must have actual or constructive notice of the "tortious act, the damage caused by the tortious act, and the causal link between the act and the damage." *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992) (citing *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139 (5th Cir. 1987)).

The question here is thus whether plaintiffs' respective cancer diagnoses put them "on guard and call[ed] for inquiry," such that they had constructive knowledge of their causes of action against Shell and Evonik. *Id.* If they had constructive knowledge as of their dates of diagnoses, then *contra non valentem* does not save their otherwise untimely claims.

In their complaint, plaintiffs allege that they "did not reasonably know that it was the Defendants' acts and omissions . . . that caused their injuries and damages until less than a year before this lawsuit was filed." [22] Specifically, they allege that "none of the Plaintiffs knew or reasonably should have known that their cancer to date was caused by exposure to the EtO emitted by the facility" within the prescriptive period.[23] Plaintiffs then

---

[22]     *Id.* at 13.
[23]     *Id.* ¶ 78.

allege a series of facts as to each plaintiff, purporting to show that they lacked constructive knowledge of their causes of action. By way of illustration, plaintiffs allege the following facts as to the first named plaintiff, Lamar Ellis, who brings suit on his own behalf and for the death of his wife, Gaynell Perrilloux-Ellis:

> Lamar Ellis lives within 6.5 miles of the facility and Gaynell Perilloux-Ellis lived at the same location and was diagnosed with breast cancer in 2016 and died in February 2020. No physician ever advised Mr. or Mrs. Ellis that Mrs. Ellis'[s] cancer may have been caused by exposure to EtO so as to reasonably put them on notice of their cause of action against Defendants. Mr. and Mrs. Ellis did not know they were exposed to dangerous amounts of EtO since it is colorless and odorless and Defendants have never advised the general public of the dangers of EtO. The first time Mr. or Mrs. Ellis had any reason to think that EtO emission from the facility was a substantial factor in causing Ms. Ellis'[s] cancer was when Mr. Ellis received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. That was the first indication Mr. or Mrs. Ellis had that EtO exposure may have been a substantial factor in causing Mrs. Ellis'[s] cancer. . . . Mr. Ellis filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided [him] any warning about EtO emitted by the facility.[24]

The complaint alleges substantially similar facts as to all other plaintiffs.[25]

---

[24]   *Id.* ¶ 80.
[25]   *Id.* ¶¶ 81-93.

11

The Court finds that these factual allegations, even accepted as true, are insufficient to support the application of *contra non valentem* and suspend the plaintiffs' prescriptive periods.   All of the plaintiffs' non-conclusory facts, fairly read, go to their *actual* knowledge, which is not the legal standard.  *Campo*, 828 So. 2d at 510.  Instead, prescription runs from the date of the plaintiffs' *constructive* knowledge.

State and federal case law regarding prescription and *contra non valentem* strongly suggest that a medical diagnosis puts a plaintiff on constructive notice of her cause of action, and thereby starts the prescriptive period.  For instance, in *Tenorio v. Exxon Mobil Corp.*, the plaintiff argued that *contra non valentem* applied because he did not know what caused his throat cancer, diagnosed in November of 2009, until he was told in August of 2013 that he may have been exposed to radiation at the job where he worked from 1981 to 1988.  *See* 170 So. 3d 269, 275 (La. App. 5 Cir.), *writ denied*, 178 So. 3d 149 (La. 2015).  The Louisiana Fifth Circuit Court of Appeal rejected the argument, and found that plaintiff's 2009 cancer diagnosis "was constructive notice sufficient to put [him] on guard and to call him to inquire into the cause of his condition." *Id.*  The court went on to say that, "[a]lthough [plaintiff] claims to not have had knowledge of the radiation exposure at Alpha Tech, the commencement of prescription began

when he should have discovered the facts upon which his cause of action was based, which was in November 2009." *Id.*

Similarly, in *Lennie v. Exxon Mobil Corp.*, the court rejected the plaintiffs' invocation of *contra non valentem*, and found that the decedent's diagnosis of lung cancer constituted constructive knowledge of his cause of action.  251 So. 3d 637, 648 (La. App. 5 Cir. 2018).  The court explained that the doctrine was inappropriate in that case for many reasons:

> [Plaintiffs] have offered no evidence as to what they understood caused [decedent]'s lung cancer and subsequent death.  There is no evidence that they reasonably relied on a doctor's explanation as to the cause of [decedent]'s lung cancer; to the contrary, they testified that they did not speak with [decedent]'s doctors about what caused his cancer.   Evidence was introduced that [decedent] was a heavy smoker, but none of the [plaintiffs] stated that they believed that smoking caused the decedent's lung cancer.  Additionally, none of the [plaintiffs] stated that they had a conversation with [decedent] himself as to what he believed caused his lung cancer.  Each of them testified that they made no inquiry whatsoever into the cause of [decedent]'s lung cancer.  While under the facts of this case it may not have been reasonable for the [plaintiffs] to contact [decedent]'s former co-workers following his death from lung cancer when they had no knowledge of [naturally occurring radioactive material], its hazardous effects, or of [decedent]'s potential exposure to it at the workplace, their failure to make even a rudimentary inquiry into the causes of [decedent]s' illness and death appears unreasonable.

*Id.* at 647-48 (footnotes omitted).  The court therefore held that decedent's "diagnosis of lung cancer in January 2010 was constructive notice sufficient

to put [plaintiffs] on guard and to call for them to inquire further into the cause of his condition." *Id.* at 648.

Most recently, the Louisiana First Circuit found that prescription ran from the date of a cancer diagnosis, and rejected the plaintiff's invocation of *contra non valentem.  See Guerin v. Travelers Indem. Co.*, 296 So. 3d 625 (La. App. 1 Cir. 2020).  In *Guerin*, plaintiff was diagnosed with multiple myeloma in 2015, and argued that his claims, filed in 2018, were not prescribed because "it was reasonable for him to simply accept his physician's explanation in 2015 that, 'well, you know, you have it, and I don't know where it came from,' and make no further inquiries into the cause of his condition until coming across a lawyer's advertisement in a magazine in June 2018." *Id.* at 631.  Consistent with *Tenorio* and *Lennie*, the court found that plaintiff's "inaction was not reasonable in light of the knowledge that he possessed, and that his diagnosis in 2015 was constructive notice sufficient to put him on guard and to call him to inquire into the cause of his condition." *Id.*  Plaintiff was thus unable to avail himself of *contra non valentem.*

The Court finds these three Louisiana appellate cases persuasive. Indeed, the Fifth Circuit recently considered this trio of cases, and emphasized the significance of a medical diagnosis in starting a plaintiff's prescriptive period.  *See Butler v. Denka Performance Elastomer, LLC*, 16

F.4th 427, 439-40 (5th Cir. 2021).  In *Butler*, the plaintiff alleged various health conditions resulting from chloroprene emissions from a nearby neoprene plant.  *Id.* at 432.  In holding that plaintiff had adequately alleged *contra non valentem* at the pleadings stage, the court distinguished *Tenorio*, *Lennie*, and *Guerin*, as cases in which "a plaintiff's *diagnosis*, more than one year prior to filing suit, constitute[d] constructive notice."  *Id.* at 440 (emphasis in original).  The court stated that this "diagnosis" distinction is "critical," and that, because the *Butler* plaintiff "was not diagnosed or otherwise told that her symptoms were a result of excessive chloroprene emissions more than one year prior to filing suit," she was able to rely on *contra non valentem* at the pleadings stage.  *Id.*

And other case law bolsters the proposition that, in most cases, a medical diagnosis will generally terminate the tolling effect of *contra non valentem* and start the running of the prescriptive period.  *See Brown*, 52 F.3d at 527 ("[C]*ontra non valentem* will suspend the running of the prescriptive period until the claimant knows or should reasonably know that he has suffered damages.  With a latent disease, this is usually upon diagnosis." (cleaned up) (citations omitted)); *Owens v. Martin*, 449 So. 2d 448, 451 n.4 (La. 1984) ("[Plaintiff] did not become aware of his cause of action against defendants until the disease was diagnosed in 1980.  In such

15

a case, *contra non valentem* would apply to suspend the running of prescription during the period between the initial damages and the diagnosis."); *Layton v. Watts Corp.*, 498 So. 2d 23, 26 (La. App. 5 Cir. 1986) ("[W]e hold that . . . the date on which plaintiff was finally diagnosed by [his doctor] and *informed* of this diagnosis, was the date on which prescription began to run." (emphasis in original)); *Cole v. Celotex*, 620 So. 2d 1154, 1157 (La. 1993) (applying *contra non valentem* to the period when plaintiff "was told by [his doctor] that the findings on his chest x-ray could be the result of several causes *besides asbestosis*," and finding that prescription started when plaintiff was eventually diagnosed with asbestosis years later (emphasis added)); *cf. Jenkins v. Bristol-Myers Squibb*, No. 14-2499, 2016 WL 10100281, at *8 (E.D. La. July 8, 2016), *aff'd*, 689 F. App'x 793 (5th Cir. 2017) (finding that the prescriptive period started before the plaintiff's diagnosis because he was "constructively notified of his cause of action when [his doctor] advised him in April 2013 that his movement issues may be linked to Abilify."); *Watson v. Glenwood Reg'l Med. Ctr.*, 163 So. 3d 817, 824 (La. App. 2 Cir.), *writ denied*, 176 So. 3d 404 (La. 2015) (finding that *contra non valentem* did not apply in a missed-diagnosis medical-malpractice case, because plaintiff had constructive notice of the missed cancer diagnosis as of the date when a doctor first told her that she had breast cancer).

Here, all fourteen plaintiffs received, or bring suit for someone who received, a cancer diagnosis. Those diagnoses span from 1999 to April 6, 2020.[26] But, despite that the diagnoses gave the plaintiffs "constructive notice sufficient to put [them] on guard and to call [them] to inquire into the cause of [their] condition[s]," *Guerin*, 296 So. 3d at 631, their pleadings contain no allegations about what specific actions they took to investigate or otherwise inquire about the causes of their cancers. For instance, plaintiffs do not allege that they asked their doctors, generally, what may have caused their cancers, or, specifically, if EtO exposure may have caused their cancers. *Cf. Miles*, 2009 WL 1323014, at *4 (applying *contra non valentem* when plaintiff asked his doctor if his kidney condition was the result of a chemical-exposure accident at work). Plaintiffs similarly do not allege that their doctors denied that EtO exposure could have caused their conditions. *Cf. id.* ("[Plaintiff] was repeatedly assured by his physicians that there was no connection between his symptoms and the SiF4 gas leak."). Nor do they allege that their doctors suggested that they had a type of cancer that was likely unrelated to EtO or other chemical exposures. *Cf. Hughes v. Olin*

---

[26]  Plaintiffs do not state in their complaint when decedents Mary Ann Fortado or Leander Cook Jack were diagnosed with breast cancer. But because these decedents died in 2018 and 2000, respectively, *id.* ¶¶ 81-82, their diagnoses must have predated the April 26, 2020 cutoff required to render their suits timely.

*Corp.*, 856 So. 2d 222, 229 (La. App. 2 Cir. 2003), *writ denied*, 866 So. 2d 828 (La. 2004) (applying *contra non valentem* until the date when plaintiff "learn[ed] that he had a lung cancer related to asbestos exposure, as opposed to a [lung] cancer . . . not related to asbestos exposure"). Indeed, plaintiffs include no allegations whatsoever about their communications with their doctors. Their failure to allege any facts supporting the inference that they conducted reasonable inquiries into the causes of their conditions makes application of *contra non valentem* inappropriate.

Furthermore, plaintiffs do not allege any other facts that might suggest that their inaction in light of their cancer diagnoses was reasonable, such that *contra non valentem* could apply to suspend their prescriptive periods. *See Lennie*, 251 So. 3d at 645 (noting that the "ultimate issue is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of defendant's conduct" (citations omitted)). For instance, plaintiffs do not allege that they lacked education. *Cf. Ducre*, 963 F.2d at 761 (applying *contra non valentem* for a plaintiff who left school after finishing the tenth grade, and noting that the "equivocal character of facts known by [plaintiff] is enhanced by [his] limited education"); *Layton*, 498 So. 2d at 25 (noting that plaintiff's "educational status and medical sophistication" were relevant as to *contra non valentem* for a plaintiff who

attended school until the fifth grade and worked as a laborer for his entire adult life).  Plaintiffs likewise do not assert that they were unable to access the internet, computers, or public news sources.  *Cf. In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 393-94 (5th Cir. 2021) (rejecting the applicability of *contra non valentem* in part because a reasonable inquiry would have revealed ample online information regarding plaintiffs' causes of action).

Nor do plaintiffs allege any other facts suggesting that information about EtO-related cancer risks in their area was somehow unknown or unavailable.  *Cf. Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 844-45 (E.D. La. 2011) (applying *contra non valentem* and emphasizing that plaintiff had alleged that the harms of benzene exposure were only "*medically recognized*," and "documented in "*internal medical studies unknown to plaintiffs*," such that "[p]laintiff would not have known about this information as a lay person outside of the medical and scientific fields" (emphasis in original)); *Leslie v. Shell Chem. LP*, No. 13-4791, 2013 WL 4517979, at *8 (E.D. La. Aug. 23, 2013) (applying *contra non valentem* because decedent's daughter had never heard or seen anything connecting benzene exposure to her father's disease, and because "reports about the effects [of benzene exposure] were circulated in certain groups of which she

19

was not a part, and not among the general public"); *Hill v. Exxon Mobil Corp.*, No. 11-2786, 2012 WL 6606960, at *4 (E.D. La. Dec. 18, 2012) (applying *contra non valentem* in a case in which plaintiff alleged that radiation exposure at work caused his heart attack, because there were no facts suggesting that radiation exposure "was known generally by lay people to be a potential cause" of heart attacks at the time of plaintiff's attack). Indeed, as to the unavailability of information about EtO and cancer, plaintiffs' allegations in fact suggest the opposite. The entire thrust of plaintiffs' complaint is that the carcinogenic effects of EtO have been known and publicized for decades.[27] And more specifically, plaintiffs have alleged that, at least as recently as 2018, it was knowable to the public that *these* plaintiffs, living in *this* area, face high cancer risks from EtO. One of plaintiffs' central allegations is that, "[i]n August of 2018, . . . the EPA released the results of the 2014 National Air Toxics Assessment ('NATA') of EtO (and other toxins)," which indicated that "there are dangerous levels of

---

[27]   *See e.g.*, *id.* ¶ 46 ("In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification."); *id.* ¶ 47 ("In 2000, the U.S. Department of Health and Human Services . . . classified EtO as 'known to be a human carcinogen.'"); *id.* ¶ 53 ("The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults tha[n] previously thought.").

airborne EtO in certain census tracts around the facility."[28]  Plaintiffs further allege that, "[e]ven worse, the report calculated that individuals living in those census tracts around the facility, which include the Plaintiffs, have some of the highest risks of cancer from EtO exposure in the country . . . ."[29] The Court finds that these allegations—emphasizing the publicly available information regarding the carcinogenic risks of EtO in the places where these plaintiffs live—tend to belie the idea that information about the cancer risks of EtO in their area was not publicly available.

In sum, all of plaintiffs' claims are prescribed on the face of the complaint, and the allegations do not support the application of *contra non valentem*.  Plaintiffs' only other means of avoiding prescription is the continuing-tort doctrine, which the Court addresses below.  However, because defendant Shell ceased operations of the facility in 1999, the continuing-tort doctrine has no application to plaintiffs' claims against it. Appropriately, plaintiffs do not argue a continuing-tort exception for their claims against Shell.[30]  Accordingly, Shell's motion to dismiss is granted in its entirety on the grounds of prescription and the non-applicability of *contra*

---

[28]   *Id.* ¶ 60.

[29]   *Id.*

[30]   *See* R. Doc. 37 at 6 n.18 ("*As to Evonik*, Plaintiffs rely on the continuing tort doctrine." (emphasis added)).

*non valentem*.   The Court dismisses these claims against Shell without prejudice.   The Court grants plaintiffs leave to amend their complaint to plead facts, specific to each plaintiff, to support the application of *contra non valentem* after their dates of diagnoses.

### 2. *Continuing Torts*

Defendant Evonik still owns and operates the facility, and plaintiffs allege continuing torts against Evonik.   A continuing tort is a tort in which "the operating cause of injury is a continuous one and gives rise to successive damages."   *Miller v. Conagra, Inc.*, 991 So. 2d 445, 456 (La. 2008).   A plaintiff asserting a suspension or interruption of prescription has the burden of demonstrating that the defendant's conduct is a continuing tort. *In re Med. Review Panel for Claim of Moses*, 788 So. 2d 1173, 1177 (La. 2001).

Here, the complaint alleges that all fourteen plaintiffs "continu[e] to experience adverse health effects because of the continued emission of EtO from the facility and [are] at risk for developing new health conditions as a result of the continued dangerous emission of EtO from the facility."[31] Plaintiffs also allege that "[t]he continued emission of EtO from the facility

---

[31]      R. Doc. 1-1 ¶¶ 12-25.

continues to cause damage by weakening [plaintiffs'] current medical condition[s]."[32]  The Court finds, and Evonik does not dispute, that this is sufficient to allege a continuing-tort exception to prescription.  *See, e.g.*, *Risin v. D.N.C. Invs., L.L.C.*, 921 So. 2d 133, 138 (La. App. 4 Cir. 2005), *writ denied*, 926 So. 2d 519 (La. 2006) (applying the continuing-tort exception to prescription because defendants continued to expose plaintiffs to lead even after plaintiff's lead-poisoning diagnosis).  Plaintiffs here allege that Evonik's harmful EtO emissions are ongoing and have not abated, and that plaintiffs are suffering ongoing damages as a result, in the form of weakened medical conditions and other adverse health effects.  Accepting these facts as true, the Court finds that plaintiffs' claims against Evonik involve continuing torts, and are therefore not prescribed.

Evonik contends that not all of plaintiffs' claims are continuing torts.  Specifically, Evonik points to plaintiffs' allegations that Evonik caused "multiple unauthorized releases of EtO in 2012 and 2013."[33]  Evonik contends that, by plaintiffs' own admission, this conduct terminated in 2013 and is not continuing.  The Court finds this argument unpersuasive.  It is clear from plaintiffs' complaint that they cite the 2012 and 2013 releases not

---

[32]     *Id.* ¶ 9.
[33]     *Id.* ¶ 59.

as discrete torts warranting individualized assessment, but instead as part of a continuum of ongoing conduct by Evonik—namely, the continued emission of EtO into the community. Indeed, the allegations regarding the 2012 and 2013 releases, placed into the context of the complaint, support this reading. In full, plaintiffs allege:

> Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized amounts of EtO into the air and water, which releases are caused by leaks, faulty equipment, and other negligence that has increased the volume of EtO in the atmosphere around the facility and the community, including *just by way of example*, multiple unauthorized releases of EtO in 2012 and 2013 that may have led to as much as 1950 lbs. of EtO being released into the atmosphere according to the facility.[34]

Because the allegedly continuing conduct is Evonik's EtO emissions—both authorized and unauthorized—the Court reject's Evonik's contention that the 2012 and 2013 releases should be carved out from, or somehow construed as undermining, application of the continuing-tort exception to plaintiffs' claims. The Court finds that plaintiffs have sufficiently alleged continuing torts by Evonik, and that their claims against Evonik are therefore not prescribed.

---

[34]    *Id.* (emphasis added).

That said, the continuing-tort doctrine does *not* toll the survival and wrongful-death claims of plaintiffs Ellis, Fortado, and Jack, because Evonik's allegedly harmful conduct as to decedents is not causing successive damages to decedents or their survivors. *See id.* at 1180 ("[F]or there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant." (citations omitted)). The Court therefore dismisses without prejudice, on the basis of prescription, the survival and wrongful-death claims of Ellis, Fortado, and Jack, on behalf of their respective spouses. These claims may proceed past the pleadings stage only if plaintiffs adequately allege *contra non valentem* upon amendment, which the Court has granted them leave to do.

## C. The Living Plaintiffs' Continuing-Tort Claims Against Evonik

The Court thus proceeds to the merits of the living plaintiffs' claims against Evonik, which rest on allegations of continuing torts by virtue of ongoing EtO emissions. Evonik contends that plaintiffs have not stated a claim on the merits of their three allegations. Specifically, the Court must determine whether plaintiffs have stated claims for negligence, battery, and nuisance.

25

1. *Negligence*

Plaintiffs allege that Evonik is liable for negligence.[35]  Under article 2315 of the Louisiana Civil Code, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."  La. Civ. Code art. 2315(A).  Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under article 2315.  *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006).  Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633.

The parties' key dispute is whether plaintiffs have adequately alleged a duty owed by Evonik.  In their complaint, plaintiffs assert that Evonik "has a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiffs."[36] They also allege that Evonik "owes a duty of ordinary care to persons

---

35   *Id.* ¶¶ 94-103.
36   *Id.* ¶ 94.

foreseeably within the reach of those airborne chemicals' known dangers to reduce [EtO] emissions to a level that do not pose an unreasonable risk of harm."[37]  Plaintiffs contend that they have adequately alleged that defendant owes a duty to act reasonably not to harm its neighbors.  Evonik contests this assertion, arguing that plaintiffs have failed to identify a specific standard of care.

A recent Fifth Circuit decision persuades this Court that plaintiffs' allegations are inadequate to state a duty under article 2315.  In *Butler v. Denka Performance Elastomer, LLC*, the Fifth Circuit considered plaintiff's appeal of the district court's dismissal of her claims arising from allegedly unsafe emissions of chloroprene in the community.  16 F.4th at 432.  As to whether plaintiff had adequately alleged a duty under Louisiana law, the court explained:

> Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another."  *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1086 (La. 2009).  She says Denka's chloroprene emissions—untethered from any particular emissions threshold—are nonetheless unreasonably excessive.
>
> . . . Butler's retreat to generalized grievances is unavailing.  While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care.  *See Lemann*, 923 So. 2d at 633.  The inquiry into a defendant's particular duty "is whether the plaintiff has any law

---

[37]    *Id.* ¶ 97.

(statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.*; *accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law"). "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000).

Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." Yet, Butler points to no "statutory," "jurisprudential," or any other source of law—and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence . . . claim.

16 F.4th at 443-46 (cleaned up).

Here, too, plaintiffs have cited no cognizable source or articulation of the duty alleged. They instead rest on the notion that Evonik has a duty to exercise "ordinary care,"[38] to "avoid an unreasonable risk of harm to persons located in the surrounding areas.,"[39] and to "reduce emissions to a level that do[es] not pose an unreasonable risk of harm."[40] But plaintiffs go no further. They fail to specify a "specific standard" of care with which Evonik should have complied. *See Lemann*, 923 So. 2d at 633.

---

[38]   *Id.* ¶ 97.
[39]   *Id.* ¶ 94.
[40]   *Id.* ¶ 97.

Plaintiffs attempt to sidestep *Butler* and demonstrate divided circuit authority in this issue, by citing the Fifth Circuit's decision in *Cedar Lodge Plantation, LLC v. CSHV Fairway View I, LLC*, 753 F. App'x 191 (5th Cir. 2018). Specifically, plaintiffs point to the court's discussion in *Cedar Lodge* of the distinction between regulatory and tort standards. The court explained:

> [R]egulatory standards do not establish the requirements for recovery by one private party against another for property damage. Rather, the Louisiana Civil Code provides much broader relief, through claims for negligence and nuisance, to a landowner whose neighbor damages his property. Defendant has cited no authority for the proposition that plaintiff cannot state a claim for allowing contaminants to come onto his property unless those contaminants exceed state regulatory standards, and we have found none.

*Id.* at 197-98. But this proposition, which plaintiffs emphasize is "well established," and does not "break . . . new ground," does not conflict with *Butler*'s instruction that a tort plaintiff must identify a specific standard of care that the defendant breached. Indeed, in *Cedar Lodge*, the court explained that, while regulatory compliance is not a defense to tort liability, "Louisiana law is clear that negligently allowing sewage to drain onto another person's property entitles the landowner to relief." *Id.* at 197. In so stating, the court cited a Louisiana case involving negligent operation of a sewage treatment system. *See Smith v. Cutts*, 759 So. 2d 851, 855 (La. App. 3 Cir.),

*writ denied*, 763 So. 2d 598 (La. 2000).  In other words, the court recognized a specific, jurisprudential source of the tort duty breached in the case before it.  And the Fifth Circuit was clear in *Butler* that a plaintiff must identify such a standard in order to state a negligence claim.  Here, plaintiffs do not identify a specific standard to which Evonik should have conformed its conduct.  That deficiency in their complaint warrants dismissal under *Butler* and Rule 12(b)(6).

Finding no specific standard of care with which Evonik ought to have complied, the Court finds, consistent with the Fifth Circuit's decision in *Butler*, that plaintiffs have not stated a claim for negligence under Louisiana law.  Evonik's motion to dismiss is granted as to plaintiffs' negligence claims. These claims are dismissed without prejudice.  The Court grants plaintiffs leave to amend their article-2315 negligence allegations to articulate a specific duty or standard of care that defendant is alleged to have breached.

### 2. *Civil Battery*

Plaintiffs also allege that Evonik is liable for civil battery.[41]  Under Louisiana law, a battery is a "harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact."

---

[41]      *Id.* ¶¶ 104-109.

*Caudle v. Betts*, 512 So. 2d 389, 391 (La. 1987). For the act to be intentional, the actor must either "(1) consciously desire the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) know that the result is substantially certain to follow from his conduct, whatever his desire may be as to that result." *Batiste v. Bayou Steel Corp.*, 45 So. 3d 167, 168 (La. 2010). Substantial certainty "requires more than a reasonable probability that an injury will occur," and plaintiffs must allege that defendants' actions made their contracting cancer "inevitable or incapable of failing." *Reeves v. Structural Pres. Sys.*, 731 So. 2d 208, 213 (La. 1999) (internal citations omitted).

Here, the Court finds that plaintiffs have not pleaded any facts supporting their conclusory recitation of the elements of battery. While plaintiffs broadly assert that the Evonik "knew that the intended emissions . . . would make contact with and be inhaled by . . . Plaintiffs," and "knew to a substantial certainty that inhalation of EtO would cause serious health risks and increased risks of cancer to those individuals,"[42] these allegations amount to "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (cleaned up) (citations omitted). Moreover, even plaintiffs' specific factual allegations do not give rise to a

---

[42]     *Id.* ¶¶ 105-106.

battery claim.  Plaintiffs assert elsewhere in their complaint that Evonik "knew, or should have known, that the EtO it was releasing was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents."[43] But even accepting that allegation as true, mere knowledge of a possible danger does not give rise to a battery claim.  *See Reeves*, 731 So. 2d at 213 ("Mere knowledge and appreciation of risk does not constitute intent . . . ." (citations omitted)); *cf. Armstead v. Schwegmann Giant Super Markets, Inc.*, 618 So. 2d 1140, 1142 (La. App. 4 Cir. 1993), *writ denied*, 629 So. 2d 347 (La. 1993) ("[M]ere knowledge . . . that a machine is dangerous and that its use, therefore, creates a high probability that someone will eventually be injured is not sufficient to meet the 'substantial certainty' requirement." (citations omitted)).

For these reasons, the Court finds that plaintiffs' claims for civil battery must be dismissed.  Evonik's motion to dismiss is granted as to the battery claims.  Because plaintiffs' battery theory is implausible, and any amendment would be futile, the Court dismisses the battery claims with prejudice, and does not grant plaintiffs leave to amend their battery allegations.  *See Forman v. Davis*, 371 U.S. 178, 182 (1962) (noting that leave to amend should be denied when an amendment would be futile).

---

[43]    *Id.* ¶ 56.

3. *Nuisance*

Finally, plaintiffs allege that Evonik is liable for nuisance, in violation of Louisiana's vicinage articles.[44]  Under article 667 of the Louisiana Civil Code:

> Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him.  However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.

La. Civ. Code art. 667.  Mere inconvenience, though, may be permissible. Under article 668, "every one has the liberty of doing on his own ground whatsoever he pleases, although it should occasion some inconvenience to his neighbor."  La. Civ. Code art. 668.  But article 669 provides that not all inconveniences need be tolerated:

> If the works or materials for any manufactory or other operation, cause an inconvenience to those in the same or in the neighboring houses, by diffusing smoke or nauseous smell, and there be no servitude established by which they are regulated, their sufferance must be determined by the rules of the police, or the customs of the place.

La. Civ. Code art. 669.

---

[44]    *Id.* ¶¶ 110-112.

These Code articles collectively "embody a balancing of rights and obligations associated with the ownership of immovables." *Badke v. USA Speedway, LLC*, 139 So. 3d 1117, 1126 (La. App. 2 Cir.), *writ denied*, 151 So. 3d 606 (La. 2014). "As a general rule, the landowner is free to exercise his rights of ownership in any manner he sees fit." *Id.* Indeed, a proprietor "may even use his property in ways which occasion some inconvenience to his neighbors." *Id.* But under article 667, "his extensive rights do not allow him to do 'real damage' to his neighbor." *Id.* (citing *Rodrigue v. Copeland*, 475 So. 2d 1071 (La. 1985)). "[A] finding of liability under Article 667 requires either proof of personal injury or physical damage to property or proof of the presence of some type of excessive or abusive conduct." *Harmonia, LLC v. Felicity Prop. Co., LLC*, 311 So. 3d 521, 528 (La. App. 4 Cir. 2020) (quoting *Lodestro Co. v. City of Shreveport*, 768 So. 2d 724, 727 (La. App. 2 Cir. 2000)).

With the exception of the "ultrahazardous" activities of pile driving and blasting with explosives—neither of which is at issue here—a claim under any or all of these three Code articles requires a showing of negligence. *See Brown v. Olin Chem. Corp.*, 231 F.3d 197, 200 (5th Cir. 2000) ("[T]he 1996 amendment to Article 667 applies to Articles 668 and 669 as well, so that stating a claim under one or more of these articles now requires a showing of

negligence.").  Accordingly, to assert a nuisance claim under any or all of these articles, plaintiffs must show that "a defendant is (1) a proprietor who (2) negligently (3) conducts 'work' on his property (4) that causes damage to his neighbor."  *See Ictech-Bendeck v. Progressive Waste Sols. of LA, Inc.*, No. 18-7889, 2019 WL 4111681, at *2 (E.D. La. Aug. 29, 2019) (citing *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., LLC*, 88 F. Supp. 3d 615, 643 (E.D. La. 2015)).

Here, plaintiffs have adequately alleged that Evonik is a proprietor whose activities on its property caused "real damage" to its neighbors. *Badke*, 139 So. 3d at 1126. Plaintiffs also adequately allege the negligence requirement, the terms of which are prescribed by the text of the Code—namely, that defendants "knew or, in the exercise of reasonable care, should have known that [their] works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that [they] failed to exercise such reasonable care."  La. Civ. Code art. 667.  Specifically, plaintiffs point to longstanding industry knowledge of the carcinogenic effects of EtO,[45] and allege that defendants failed to prevent the damage caused by their EtO emissions.[46]  The Court finds that these allegations are

---

[45]    *See id*. ¶¶ 36-53.
[46]    *See id*. ¶¶ 54-59; *see also id*. ¶ 112.

sufficient at the pleadings stage to support a nuisance claim under the vicinage articles of the Louisiana Civil Code. *See Taylor v. Denka Performance Elastomer LLC*, No. 17-7668, 2018 WL 5786051, at *4-5 (E.D. La. Nov. 5, 2018) (denying defendant's motion to dismiss plaintiffs' nuisance claims arising out of community exposure to chloroprene from defendant's facility).

Defendants' arguments to the contrary are unconvincing. First, Evonik and Shell both argue that plaintiffs' complaint lacks factual allegations regarding how they have been inconvenienced or precluded from enjoying their property. But this framing of plaintiffs' burden, which focuses on the enjoyment of property, ignores the Code's instruction that a proprietor has a duty not just to avoid "depriv[ing] his neighbor of enjoyment" of his property, but also to avoid "*caus[ing] damage to him.*" La. Civ. Code art. 667 (emphasis added). Seemingly aware of this problem, Evonik goes on to contend that plaintiffs allege "inconvenience[] and damage[]" merely on the basis that they live near the facility, and that EtO is in the air.[47] Evonik asserts that plaintiffs have not alleged "any physical manifestation of symptoms when they use or enjoy their property." [48]   But this is a

---

[47]   R. Doc. 35-1 at 18.
[48]   *Id.*

mischaracterization of plaintiffs' complaint, which alleges not only that plaintiffs live near the facility and have been exposed to dangerous levels of EtO, but that they *developed cancer as a result*.  The Court finds that plaintiffs' cancer diagnoses plainly qualify as "real damage."

Second, Shell[49] argues that plaintiffs have not stated claims under articles 668 and 669, because those articles pertain only to property damage, and excessive inconveniences such as smoke or nauseous smells.  But as discussed, plaintiffs have adequately alleged real damage, in the form of cancer, which is a higher showing than inconvenience.  Louisiana courts have explained that the question of when a proprietor's acts "cease to be inconveniences and become damaging is a question of fact." *Badke*, 139 So. 3d at 1126.  This question turns on "the reasonableness of the conduct in light of the circumstances," and requires "consideration of factors such as the character of the neighborhood, the degree of intrusion and the effect of the activity on the health and safety of the neighbors."  *Id*.  Because these plaintiffs have adequately alleged real damage under article 667, the Court finds that, for the same reasons, they have adequately alleged excessive

---

[49]   While the Court has granted Shell's motion to dismiss solely on the grounds of prescription, the Court addresses, for the sake of thoroughness, its arguments on the merits of plaintiffs' nuisance claims.

inconvenience under articles 668 and 669.  Whether plaintiffs' health conditions are ultimately shown to be "real damage" or "excessive inconvenience" is a question for the factfinder.  At this stage, plaintiffs' allegations are sufficient to survive past the pleadings.

Finally, Shell emphasizes that plaintiffs must demonstrate negligence to prevail on their nuisance claims, and that, because they have not stated claims for negligence, neither have they stated claims for nuisance.  But this argument conflates the general negligence standard under article 2315 with the distinct negligence requirement for a nuisance claim under Louisiana's vicinage articles, which deal specifically with a proprietor's relationship to his neighbors.  In the context of general negligence, liability requires that the defendant had a duty to conform his conduct to some specific standard. *Lemann*, 923 So. 2d at 633.  As discussed above, it is this element that plaintiffs have failed to allege as part of their negligence claims.  In the vicinage context, the Code itself establishes the standard of conduct between a proprietor and his neighbors.  Specifically, the Code provides that the proprietor's liability for damages arises if he "knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care."  La. Civ. Code art. 667.

Accordingly, unlike their article 2315 general-negligence claims, plaintiffs' nuisance claims do not require an allegation of a separate source of duty. The proprietor's duty to his neighbors is established by the Code itself, and it stems from the nature of the parties' relationships as neighbors. *See* A.N. Yiannopoulous, 4 La. Civ. L. Treatise, Predial Servitudes § 3:16 (4th ed. 2021) ("[E]very landowner is bound by certain obligations of vicinage prohibiting him from causing damage or inconvenience to neighbors . . . ."); *see also Yokum v. 615 Bourbon St., L.L.C.*, 977 So. 2d 859, 867 (La. 2008) (noting "the servitude and vicinage duties of articles 667, 668, and 669"); *Badke*, 139 So. 3d at 1126 (noting "the obligations of neighborhood established by [articles] 667-669").

For these reasons, the Court denies Evonik's motion to dismiss as to plaintiffs' nuisance claims under articles 667-669 of the Louisiana Civil Code.

### D.    Severance

Having ruled on Shell's and Evonik's motions to dismiss, the Court finds that it is appropriate to sever this case into fourteen distinct civil actions. On March 28, 2022, the Court ordered the parties to show cause why this case should not be severed under Rule 21 of the Federal Rules of

Civil Procedure.[50]  Plaintiffs responded that they oppose severance;[51] Shell did not take a position on severance;[52] and Evonik responded that severance was appropriate.[53]  But all three parties requested that any decision on severance be deferred until after the Court's ruling on Shell's and Evonik's pending motions to dismiss.

Under Rule 21, a district court has "broad discretion" to sever improperly joined parties and claims. *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994); *see also Anderson v. Red River Waterway Comm'n*, 231 F.3d 211, 214 (5th Cir. 2000).  Rule 20(a)(1) provides that plaintiffs may be joined together in one action if (1) the asserted right to relief arises "out of the same transaction, occurrence, or series of transactions or occurrences," and (2) the action will present a question of law or fact common to all of the plaintiffs.  Fed. R. Civ. P. 20(a)(1).  Both requirements must be met for the parties to be properly joined.  *See Porter v. Milliken & Michaels, Inc.*, No. 09-199, 2000 WL 1059849, at * 1 (E.D. La. Aug. 1, 2000); *see also* Wright & Miller, Federal Practice and Procedure § 1653 (3d ed. 2021).

---

[50]    R. Doc. 48.
[51]    R. Doc. 51.
[52]    R. Doc. 53.
[53]    R. Doc. 54.

Furthermore, even if parties are properly joined under Rule 20(a), the court may, in its discretion, choose to sever parties under Rule 21, which provides that, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21; *see also United States v. O'Neil*, 709 F.2d 361, 369 (5th Cir. 1983). To decide whether Rule 21 severance is appropriate, the court considers the two 20(a) criteria alongside other considerations, including whether settlement or judicial economy would be promoted, whether prejudice would be averted by severance, and whether different witnesses and documentary proof are required for separate claims. *Rohr v. Metro. Ins. & Cas. Co.*, No. 06-10511, 2007 WL 163037, at *2 (E.D. La. Jan. 17, 2007); *E. Cornell Malone Corp. v. Sisters of the Holy Fam., St. Mary's Acad. of the Holy Fam.*, 922 F. Supp. 2d 550, 561 (E.D. La. 2013). Severance of plaintiffs' claims results in the creation of separate civil actions. *O'Neil*, 709 F.2d at 368.

Here, irrespective of whether joinder was permissible under Rule 20(a)—which the Court does not decide—there is no question that severance is appropriate under Rule 21, in light of the significant differences in the factual and legal issues involved in each plaintiff's claims.

First, there are significant differences in the timing and length of each plaintiff's alleged exposure to EtO. Specifically, some plaintiffs allege that

they have lived near the facility for more than seventy years,[54] while others have lived there for somewhere between thirty to fifty years.[55]  Still others have lived in the area for fewer than twenty years.[56]  These distinct periods of exposure mean that each plaintiff's case will require and yield differing facts regarding, for instance, the actual emissions of EtO over various years, and the respective responsibilities, knowledge, and acts of Shell and Evonik during these various periods of time.  The distinct periods of exposure will also bear on each plaintiff's showing of fault and causation, thereby affecting the legal viability of each plaintiff's case.  These timing distinctions strongly favor severance of the plaintiffs' claims.

Second, plaintiffs' exposures occurred at different locations.  Some plaintiffs live within one mile of the facility,[57] while others live over six miles away from the facility.[58]  Relatedly, there is no indication that plaintiffs worked or otherwise handled their day-to-day responsibilities in similar locations.  These differences bear heavily on the causation element of each plaintiff's claims.  A plaintiff who worked all day in their home near the facility surely has a different case, and faces different defenses, than one who

---

[54]   R. Doc. 1-1 ¶¶ 16, 24.
[55]   *Id.* ¶¶ 13-14, 17, 19-20, 22-23.
[56]   *Id.* ¶¶ 12, 25.
[57]   *Id.* ¶¶ 83, 85.
[58]   *Id.* ¶¶ 80-81.

worked far out of town, away from the facility and possibly exposed to other toxins or risk factors.  Put simply, in a case whose core allegation is years-long exposure to an airborne toxin, differences in location matter.  This consideration further militates against joinder of all fourteen plaintiffs.

Third, it is plain from the face of the complaint, and from the Court's above analysis on defendants' motions to dismiss, that each plaintiff's claims will present distinct legal issues and involve nonoverlapping legal analyses.  Most obviously, the issue of prescription must be analyzed individually.  As discussed above, in order for plaintiffs' claims not to be dismissed as prescribed, they must plead facts entitling them to application of the *contra non valentem* doctrine.  These allegations will necessarily be unique to each plaintiff, and the applicability of *contra non valentem* will vary from plaintiff to plaintiff.  Furthermore, three of these plaintiffs bring survival and wrongful-death actions on behalf of a deceased spouse; the eleven others do not.  This is a clear and important legal difference.  Relatedly, the three plaintiffs who bring survival and wrongful-death actions allege ongoing harm from EtO emissions, but do not allege that they have cancer or any other medical condition.  The other eleven plaintiffs have been diagnosed with various types of cancer.  Again, therefore, plaintiffs' cases present distinct legal questions.  Moreover, pursuant to this order, the Court has

dismissed with prejudice plaintiffs Ellis's and Villa's claims against defendant Shell, because Ellis and Villa do not allege that they lived near the facility when Shell owned and operated it. Those two plaintiffs therefore have claims only against Evonik. These and other differences in the legal questions presented by each plaintiff's claims weigh heavily in favor of severance.

Fourth, litigation of these claims will involve extensive medical evidence that is sure to vary across plaintiffs. While all fourteen plaintiffs and/or decedents have been diagnosed with cancer, they have different types of cancer. Some have breast cancer, while others have lymphoma of varying types. Moreover, there is no indication that the plaintiffs share common risk factors for the development of cancer, including age, genetics, family history, exposure to other carcinogens, and alcohol and drug use. And the import of these differences is further compounded the differences discussed above, regarding the timing, location, and therefore the *degree*, of plaintiffs' or decedents' respective exposures to EtO. Accordingly, the nature and extent of defendants' liability will be unique to each plaintiff. The same is true for damages. Plaintiffs and decedents were diagnosed with cancer at different times, and certainly have incurred different medical expenses and other past

damages.  Similarly, differences in prognoses and plans for treatment will affect each plaintiff's entitlement to future damages.

For these same reasons, the necessary witnesses and documentary proof will vary widely across plaintiffs, as each plaintiff will need to submit their own medical records, as well as testimony from their treating physicians, family members, and other witnesses unique to them or their deceased spouse.  The highly individualized nature of these medical inquiries further persuades this Court that severance is proper.  *Cf. Guilbeau v. Wyeth, Inc.*, No. 09-1652, 2010 WL 2216710, at *2 (W.D. La. May 28, 2010) (granting a motion to sever in a products-liability case where "each plaintiff's claim involves different medical histories, different courses of treatment and/or underlying conditions, different prescribing physicians, different alleged periods of ingestion, different alleged injuries and different treatment options and risks," meaning that, therefore, "each case will require separate factual analysis as to medical causation and damages").

Fifth, these cases are clearly destined for separate trials.  Trying all fourteen cases to the same jury would be unduly prejudicial to defendants, and would pose an unacceptable risk of confusing the jury.  For instance, as one court has explained, "by trying . . . two [plaintiffs'] claims together, one plaintiff, despite a weaker case of causation, could benefit merely through

association with the stronger plaintiff's case." *Rubio v. Monsanto Co.*, 181 F. Supp. 3d 746, 758 (C.D. Cal. 2016).   And because separate trials are inevitable, the Court finds its appropriate to sever the cases at this stage, before the start of discovery.   Indeed, the judge who will preside over each plaintiff's trial is best situated to issue rulings on dispositive motions, and *Daubert* and other evidentiary motions.

For these reasons, the Court finds that joinder of the fourteen plaintiffs' claims is not appropriate.   On the contrary, the significant factual and legal differences among plaintiffs' claims warrant severance.   The Court therefore severs plaintiffs' claims under Rule 21 of the Federal Rules of Civil Procedure.

## IV.   CONCLUSION

For the foregoing reasons, the Court GRANTS Shell's motion to dismiss.[59]   The Court GRANTS IN PART, and DENIES IN PART, Evonik's motion to dismiss.[60]   The motion is granted as to the survival and wrongful-death claims of Lamar Ellis, Leroy Fortado, Sr., and Ervin Jack, Jr., which do not amount to continuing torts.   The motion is also granted as to all plaintiffs'

---

[59]   R. Doc. 33.
[60]   R. Doc. 35.

claims for negligence and civil battery.  The motion is denied as to plaintiffs'
continuing-tort claims under Louisiana's vicinage articles.

Plaintiffs are granted leave to amend their allegations with respect to
(1) the date when plaintiff Margie Moore began experiencing EtO exposure,
(2) specific facts supporting the application of *contra non valentem*, and
(3) the duty allegedly breached by these defendants, thereby supporting
claims for general negligence under article 2315 of the Louisiana Civil Code.

Plaintiffs are NOT granted leave to amend the dates when plaintiffs
and decedents Lamar Ellis, Gaynell Perrilloux-Ellis, and Ginger Villa began
experiencing EtO exposure.  Ellis's and Villa's claims against Shell are
DISMISSED WITH PREJUDICE.  Plaintiffs are also NOT granted leave to
amend their civil-battery allegations.  All battery claims are DISMISSED
WITH PREJUDICE.

It is FURTHER ORDERED that this case shall be SEVERED into
fourteen distinct civil actions.  This case, Case No. 21-1089, with named
plaintiff Lamar Ellis, shall remain assigned to Section R.  The Clerk of Court
is ORDERED to sever the other thirteen plaintiffs, and reallot the thirteen
severed cases among the judges of the U.S. District Court for the Eastern
District of Louisiana.  For the purposes of Local Rules 3.1 and 3.1.1, this Court
has determined that the claims of the fourteen plaintiffs are not related.

It is FURTHER ORDERED that plaintiffs are granted **fourteen (14) days** from the date of severance to file amended complaints in the severed actions, confining the allegations therein to the respective plaintiff.

It is FURTHER ORDERED that, in each of the newly created cases, the respective plaintiff shall pay to the Clerk of Court a filing fee of $402.00, at the time when the amended complaint is filed.

New Orleans, Louisiana, this __27th__ day of May, 2022.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

48