# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LAMAR ELLIS**<br>　　　　**PLAINTIFF**<br><br>**VS.**<br><br>**EVONIK CORPORATION, ET AL.,**<br>　　　　**DEFENDANTS** | **CIVIL ACTION NO. 2:21-CV-1089**<br><br>**SECTION "R" (3)**<br><br>**DISTRICT JUDGE SARAH S. VANCE**<br><br>**MAGISTRATE DANA M. DOUGLAS** |

## FIRST AMENDED COMPLAINT

Plaintiff Lamar Ellis, through his undersigned counsel, files the following Amended Complaint pursuant to the Court's Order and Reasons (Doc. 55).

## INTRODUCTION

1. Lamar Ellis and his now deceased wife, Gaynell Perrilloux-Ellis, moved to their home located near a petrochemical manufacturing facility in Reserve, Louisiana in 2005. The facility, currently operated by Evonik Corporation, and previously operated by Evonik Materials Corporation, Versum Material Performance Manufacturing, Inc., Air Products Performance Manufacturing, Inc., Tomah Reserve, Inc., has emitted dangerous levels of Ethylene Oxide ("EtO") for decades and continues to emit dangerous levels of EtO as of the filing of this Amended Complaint. Mrs. Ellis contracted cancer and died as a result of the emissions of EtO from the facility, and Mr. Ellis is at risk for developing cancer and other health problems due to his continued exposure to EtO from the facility which has never abated at any time. The Defendants have long known of the dangerous effects of EtO as a carcinogen and had the ability to protect their neighbors by reducing or eliminating their emission of EtO, but instead chose, and continue to choose, to emit dangerous levels of EtO in the community surrounding the facility in order to maximize their profits without ever

1

informing Mr. and Mrs. Ellis, or the rest of the surrounding community, of the life-threatening effects of the facility's EtO emissions.

2. EtO is a cancer-causing gas.

3. The United States Environmental Protection Agency (EPA), the National Toxicology Program, the World Health Organization, and the International Agency for Research on Cancer (IARC) all classify EtO as a known human carcinogen.

4. Over decades and continuing to the present day, the facility has emitted many hundreds of tons of EtO into the air, forcing its residential neighbors to breathe its toxic emissions day after day.

5. Although the owners and operators of the facility know and have long known of hazards of EtO, they have chosen to protect their profits rather than the health of their neighbors and have continued to emit dangerous levels of EtO, a carcinogen, in amounts that caused the ambient air in the surrounding communities to have dangerously high EtO concentrations.

6. EtO is colorless and odorless and therefore Mr. and Mrs. Ellis were not able to see or smell the EtO that was in the air around them and which they breathed.

7. Mrs. Ellis was unknowingly exposed to and inhaled dangerous levels of EtO in the air from the facility.

8. Mrs. Ellis's inhalation of the EtO emitted from the facility was a substantial factor in causing her to develop cancer and die.

9. The continued emission of EtO from the facility continues to cause damages to Mr. Ellis by increasing his risk of developing cancer.

**PLAINTIFF**

10. Lamar Ellis, individually on behalf of his deceased wife Gaynell Perrilloux-Ellis, is a person of the age of majority is who is domiciled in St. John the Baptist Parish. Mr. Ellis has been and continues to be exposed to EtO from the facility at his home located at 3033 English Colony, Laplace LA 70068 where his wife Gaynelle Perrilloux-Ellis also lived with him beginning in 2005. Ms. Perilloux-Ellis died of breast cancer at the age of 51 on February 6, 2020. Mr. Ellis is at increased risk for developing cancer and new health conditions as a result of the continued dangerous emission of EtO from the facility to which he is continuously exposed.

**DEFENDANTS**[1]

11. Evonik Corporation ("Evonik") is a corporation organized under the laws of Alabama with its principal place of business in New Jersey that currently operates the facility.

---

[1] Plaintiff originally filed suit in Louisiana state court, along with 13 other co-plaintiffs, naming Louisiana citizens Randy Cashio, James Carter, Artis Williams, and Kerry Harrison as defendants (collectively "the Facility Manager Defendants") and asserting claims against the Facility Manager Defendants under Louisiana law for negligence and civil battery.

Defendant Evonik removed the case to this Court based on the alleged fraudulent joinder of the Facility Manager Defendants. Plaintiffs moved to remand the suit based on lack of subject matter jurisdiction (Doc. 19) because Plaintiffs had asserted viable claims under Louisiana law against the Facility Manager Defendants, who were non-diverse from Plaintiffs. The Court denied Plaintiffs' Motion to Remand and dismissed the claims against the diverse and non-diverse Facility Manager Defendants (Doc. 28).

Plaintiff contends that the Order and Reasons denying remand was erroneous and that Plaintiff's allegations and claims against the Facility Manager Defendants were sufficient under Louisiana law to state a plausible claim for negligence and civil battery and should not have been dismissed. Consequently, Plaintiff contends that this Court does not have jurisdiction to hear this matter because Louisiana citizens Randy Cashio, James Carter, Artis Williams, and Kerry Harrison were properly named as defendants in the original petition, and the dismissal of them based on fraudulent joinder was reversible error.

12. Evonik Materials Corporation ("EMC") is a corporation organized under the laws of Delaware with its principal place of business in Reserve, LA that operated the facility from 2017 to 2019.

13. Versum Materials Performance Manufacturing, Inc. ("Versum") is a corporation organized under the laws of Delaware that had its principal place of business in Reserve, LA that formerly operated the facility in 2016.

14. Air Products Performance Manufacturing, Inc., ("APPMI") is a corporation organized under the laws of Delaware that had a principal place of business in Louisiana and previously operated the facility from 2007 to 2016.

15. Tomah Reserve, Inc. ("Tomah") is a corporation organized under the laws of Delaware that had its principal place of business in Reserve, LA that formerly operated the facility from 1999 to 2007.

16. Evonik is the legal successor in interest of EMC, Versum, APPMI, and Tomah.

## FACTUAL BACKGROUND

17. Ethylene oxide is a flammable, colorless gas used to make other chemicals that are used in making a range of products, including antifreeze, textiles, plastics, detergents and adhesives. Ethylene oxide also is used to sterilize equipment and plastic devices.[2]

---

Nonetheless, in compliance with the Court's Orders, Plaintiff is filing this Amended Complaint which does not name the non-diverse Facility Manager Defendants and does not assert claims against them. However, Plaintiff expressly reserves all appellate rights regarding the dismissal of the claims against the Facility Manager Defendants.

[2]    https://www.epa.gov/hazardous-air-pollutants-ethylene-oxide/background-information-ethylene-oxide#what

18. The facility emits huge volumes of EtO every year into the community where Plaintiff resides, and the emissions continue at this time.

19. People cannot see or smell ethylene dioxide and, consequently, Plaintiff and Mrs. Ellis were exposed to EtO from the facility for many years without their knowledge while Defendants knew, or should have known, that that the EtO from the facility was dangerous, toxic, carcinogenic, mutagenic, and harmful to local residents.

20. EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants," also called "air toxics." It is dangerous, toxic, carcinogenic, and mutagenic (damaging to DNA at the cellular level). EtO is highly reactive, readily taken up by the lungs, efficiently absorbed into the blood stream, and easily distributed throughout the human body. Its deleterious properties have been widely known for decades in the industrial community, but not to the general population.

21. Scientific and industry studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells, including, but not limited to, non-Hodgkin lymphoma, myeloma, and lymphocytic leukemia. Scientific and industry also show that long-term exposure to EtO increases the risk of breast cancer.

22. The DNA-damaging properties of EtO have been studied since the 1940s.

23. U.S. chemical companies became broadly aware of EtO's carcinogenic effects in 1977, when the National Institute of Occupational Safety and Health (NIOSH) recommended that EtO be considered as mutagenic and potentially carcinogenic to humans.[3]

---

[3] Center for Disease Control & Prevention, Special Occupational Hazard Review with Control Recommendations: Use Of Ethylene Oxide As A Sterilant In Medical Facilities, August 1977, https://www.cdc.gov/niosh/docs/77-200/default.html

5

24. In 1981, based on additional lab studies wherein EtO induced cancer in animals, NIOSH reconfirmed its concerns that EtO was a potential occupational carcinogen.[4]

25. In 1985, the U.S. Department of Health and Human Services published the Fourth Annual Report on Carcinogens and classified EtO as reasonably anticipated to be a human carcinogen.

26. California declared EtO as a human carcinogen in 1987.

27. In 1994, the World Health Organization listed EtO as a Group 1 human carcinogen, the agency's highest risk classification.

28. In 2000, the U.S. Department of Health and Human Services revised classified EtO as "known to be a human carcinogen."

29. In 2002, the U.S. National Toxicology Program classified EtO as "known to be a human carcinogen" based on "sufficient evidence of carcinogenicity from studies in humans."

30. NIOSH published a study in 2004 found positive exposure-response trends for lymphohematopoietic cancer mortality in males and for breast cancer mortality in females.

31. An EPA advisory panel agreed in 2007 that EtO is a carcinogen and advised the EPA to make improvements to risk assessments.

32. In 2007, the American Chemistry Counsel and Ethylene Oxide/Ethylene Glycols Panel a manual regarding EtO and noting the association between EtO and breast and blood cancers.

33. In 2009, California added EtO to list of toxic substances.

34. The EPA classified EtO as a human carcinogen and increased the cancer risk value for EtO in December 2016, estimating the chemical to be 30 times more carcinogenic to adults that

---

[4] Center for Disease Control, Current Intelligence Bulletin 35, May 1981, Evidence of Carcinogenicity, https://www.cdc.gov/niosh/docs/81-130/default.html

previously thought. The EPA considers any exposure, however small, to create cancer risk. This is because EtO is a powerful mutagen and can damage DNA.

### Emissions from the Facility

35. The facility emits huge volumes of EtO gas every year which emissions contaminate the air in communities in proximity to the facility.

36. The EtO emitted by the facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities through prevailing winds. Because its half-life in the atmosphere is 211 days, EtO remains in the air that the residents in the community near the plant breathe long after it has been emitted.[5]

37. Defendants have operated the facility without sufficient emissions and leak controls to reasonably limit and/or eliminate the emissions of toxic EtO and, as a result, exposed Mrs. Ellis and continue to expose Plaintiff to a carcinogenic, mutagenic chemical that ultimately led to Mrs. Ellis's death and which has increased Plaintiff's likelihood of developing cancer.

38. The facility continues to emit dangerous levels of EtO at the present time; levels that the EPA characterizes as not "sufficiently protective of human health."

39. Not only does the facility emit state-authorized amounts of EtO into the atmosphere, which are still excessive and dangerous to persons working and living near the facility, but the facility releases unauthorized amounts of EtO into the air and water, which fugitive releases are caused by undetected and unrepaired leaks, faulty equipment, and other negligence. Fugitive EtO emissions from the facility have dramatically increased the volume of EtO in the atmosphere around the facility and in the community, including just by way of example,

---

[5] https://www.ncbi.nlm.nih.gov/books/NBK321408/

multiple unauthorized releases of EtO in 2012 and 2013 that may have led to as much as 1950 lbs. of EtO being released into the atmosphere according to the facility, which is approximately the same amount of planned emissions that were released those years such that the fugitive emissions doubled the amount of EtO in the air.

### The Risk of Cancer Near the Facility is the Highest in the U.S.

40. On information and belief, the 2014 NATA results were not communicated to any lay persons and the citizens of St. John the Baptist Parish, although the EPA Office of Inspector General (OIG) issued a management alert in March 2020 that called on the EPA, state, and/or local officials to provide information about EtO to the community and impacted residents who faced increased and "unacceptable" risks of cancer from certain facilities' EtO emissions, specifically including the Evonik facility. The 2020 OIG alert called on the EPA to conduct risk assessments of the identified facilities, including Evonik's, and to develop new emissions standards for facilities emitting EtO that are creating such unreasonable risks for the community. The EPA's assessment confirmed that individuals living near the Evonik facility have a risk of developing cancer that is eight times what the EPA considers to be "acceptable." Despite the OIG's 2020 alert, there was no public awareness initiative or campaign by the Defendants, the EPA, or any other local, state, or federal government agency to educate the community until 2021, when the first public outreach community meeting was organized by the EPA to inform local residents of the risk faced from living near the facility.

41. The first public community outreach meeting regarding the facility's EtO emissions, organized by the EPA in conjunction with the LDEQ, was held on August 21, 2021, after Mrs. Ellis's death. The purpose of the meeting was to inform residents living near Evonik's plant that they face an increased risk of developing cancer from Evonik's EtO emissions and

that Evonik's EtO emissions controls do not sufficiently protect human health. Prior to that, notwithstanding the AIG's 2020 alert, no governmental agency nor any of the Defendants had taken any steps in the community to warn or inform residents like Plaintiff that the facility emitted EtO, that EtO is a carcinogen, that the levels of EtO emissions from the facility increased residents' risk of developing cancer, and that the facility's emissions controls are not sufficiently protective of human health.[6]

42. At that meeting, the EPA explained that, based on the cancer risk the facility's EtO emissions cause to the communities around it, the EPA considers the facility's emission levels to "not be sufficiently protective of human health" despite a reported reduction in emissions from 2014 to 2020. Even though the EPA advised that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards even though within permitted limits.

43. Regarding the claimed reduction in levels of EtO emissions from 2014 to 2020, the decrease in EtO emitted into the ambient air was mostly attributable to the facility reducing fugitive EtO emissions; *i.e.*, unplanned emissions caused by leaks in equipment, faulty processes, accidents, and other negligence. According to the EPA, with government scrutiny and pressure on it, the facility was able to reduce unplanned fugitive emissions by 92% from 2014 to 2020, and that was mostly the result of improvements in the facility's mandated leak detection and repair program ("LDAR").

---

[6] A transcript and video of the meeting is available on the EPA's website.

44. The EPA reported that the remaining reduction in EtO emissions was due to improvements to the operation of the facility's stack scrubber, which is the system and equipment used to control planned and known EtO emissions from the facility.

45. According to the EPA, Evonik has plans to continue improving and "enhancing" its LDAR program and scrubber operations to reduce further fugitive and planned EtO emissions from the facility, as the emissions still expose residents in the census tracts around the plant, which includes Plaintiff, to what the EPA considers an unacceptable risk of developing cancer.

**Defendants have a duty to conform to the standards of care set forth in the EPA-approved state operating permit program, which is administered by the LDEQ and is set forth in L.A.C. 33:III.**

46. The permits issued to the facility by the LDEQ pursuant to L.A.C. 33:111 (the "Environmental Regulatory Code") limit the amounts of hazardous chemicals, including EtO, that may be discharged into the air and water and are intended to control such emissions. The permits and regulatory program address all aspects of emissions into the air and water, including the installation, operation, and maintenance of emission-control measures and equipment; emission-monitoring requirements; and leak-monitoring requirements and systems. The LDEQ's stated purpose in regulating emissions through these permits is to protect the health, safety, and welfare of the public.

47. The Environmental Regulatory Code requires the Defendants to conform their conduct to specific standards of care, including with respect to the control of emissions of air contaminants like EtO from the facility. Pursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at "point sources" where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions.

*E.g.*, L.A.C. 33:111.905; 33:III.2121. Stringent LDAR programs that effectively monitor for and result in quick repairs to leaks and other sources of unplanned fugitive emissions are mandated. In other words, the Defendants are required to act diligently to make every reasonable effort to limit and control both planned and unplanned releases of EtO into the air, regardless of whether ambient air quality standards in affected areas and permit limits are exceeded or not. Nevertheless, as made clear during the August 2021 community meeting regarding the facility, the Defendants failed to act reasonably and diligently in controlling planned EtO emissions from its scrubber – a source point – and from unplanned fugitive emissions from leaks and faulty equipment and are still taking steps to try to conform their conduct to the required standards of care to protect the public health of the Plaintiff and other residents who have lived and still live near the facility.

**Mr. and Mrs. Ellis did not reasonably know that it was the Defendants' acts and omissions that caused Mrs. Ellis's cancer and death until less than a year before this lawsuit was filed.**

48. The facility has continuously emitted dangerous levels of EtO that was inhaled by Mrs. Ellis and which continues to be breathed in by Plaintiff, and the tortious emission of EtO has never abated.

49. As a result of the above-described acts and omissions by the Defendants, exposure to the unsafe levels of EtO from the facility was a substantial factor in Mrs. Ellis's development of cancer and death and in Plaintiff's increased risk of developing cancer.

50. Defendants' misrepresentations about of the carcinogenic quality of EtO impeded the Plaintiff's ability to assert the causes of action stated herein and Defendants' actions and inactions did, in fact, delay the Plaintiff's discovery that Mrs. Ellis's death and his own risk of cancer alleged herein had been caused by exposure to EtO.

51. Mr. and Mrs. Ellis did not have any reasonable access to or knowledge of the body of industry and scientific information regarding the dangers of EtO. Nor did they know about the 2014 NATA results, as those results were not widely publicized to lay persons in the communities around the facility until after this suit was filed. No one with access to that kind of information and with an understanding of the dangers Mr. and Mrs. Ellis faced from living near the facility or their elevated risk of developing cancer provided information to the community where they live until August 2021, when the EPA and LDEQ finally organized a public community outreach meeting.

52. Although Mrs. Ellis was diagnosed more than one year prior to the date of the original Petition, Plaintiff did not know nor reasonably should have known that Mrs. Ellis's cancer and death were caused by exposure to the EtO emitted by the facility before one year prior to the date of the original Petition.

53. Mr. Ellis lives within 6.5 miles of the facility and Gaynell Perrilloux-Ellis lived at the same location and was diagnosed with breast cancer in 2016 and died in February of 2020. No physician ever advised Mr. or Mrs. Ellis that Mrs. Ellis' cancer may have been caused by exposure to EtO so as to reasonably put them on notice of their cause of action against Defendants. Mrs. Ellis thought at the time of her diagnosis that her cancer could be hereditary and did not know anything about EtO to ask her physicians any questions about her exposure, which was also unknown to her at the time, and cancer. Mr. and Mrs. Ellis did not know at that time what EtO was or that they were exposed to dangerous amounts of EtO since it is colorless and odorless, and Defendants have never advised the general public of the dangers of EtO. Mr. and Mrs. Ellis also had no knowledge of the operations of the facility at any time, did not know that it emitted EtO, and did not know that the emissions of EtO were

subject to regulation and the subject of scientific and industry studies. Neither Mr. nor Mrs. Ellis had any education related to chemistry beyond high school studies. Mr. and Mrs. Ellis did not know how to research information related to operations and emissions of the facility even if they wanted to do so. The first time Mr. or Mrs. Ellis had any reason to think that EtO emission from the facility was a substantial factor in causing Ms. Ellis' cancer was when Mr. Ellis received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. The advertisement advised that people living near the facility may have legal rights because of the emissions of EtO from the facility. The receipt of the advertisement was the first time Mr. or Mr. Ellis ever knew of the existence of EtO. That the facility emitted EtO was not common knowledge among lay persons in the community and was never discussed or brought to Mr. and Mr. Ellis's attention prior to receiving the mailer. That was the first indication Mr. or Mrs. Ellis had that EtO exposure may have been a substantial factor in causing Mrs. Ellis' cancer. Thereafter Mr. Ellis took reasonable steps to investigate whether exposure to EtO had caused Ms. Ellis' cancer or created a risk of future cancer for Mr. Ellis. Mr. Ellis filed this action within one year of learning facts supporting that he had a cause of action against Defendants. No one from the local, state, or federal government has directly provided him any warning about EtO emitted by the facility.

## CAUSES OF ACTION

### Count 1 – Negligence

54. Defendants have a duty to operate the facility in such a way as to avoid an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiff and Mrs. Ellis.

55. Defendants knew that a person's exposure to EtO in the ambient air could cause cancer and that EtO has been and continues to be emitted from the facility into the ambient air around

the facility in levels that result in cancer risks that far exceed what the EPA considers acceptable.

56. Defendants knew or should have known that that its EtO emissions were likely to cause adverse health effects in the neighboring exposed population.

57. As the operators of the facility with control over the levels of EtO released from the facility, Defendants owe a duty of ordinary care to persons foreseeably within the reach of those airborne chemicals' known dangers to reduce emissions to a level that do not pose an unreasonable risk of harm and unacceptable risk of cancer. Defendants breached that duty by, among other things, emitting EtO from facility in amounts that create an unreasonable and foreseeable risk of harm to persons located in the neighboring community, including Plaintiff and Mrs. Ellis. Furthermore, Defendants' actions actually caused harm to persons located in the surrounding areas, including the harms suffered by Mr. and Mrs. Ellis.

58. Defendants also owe a duty to the residents living near the facility to conform their conduct and the facility's EtO emissions to the standards of care set out in the Environmental Regulatory Code regarding emissions controls, including through acting diligently and reasonably to control and limit planned emissions and unplanned fugitive emissions. Defendants breached that duty by, among other things, not maintaining the facility's emissions control systems and equipment in a reasonably diligent manner and by negligently failing to detect and repair leaks and faulty systems and equipment in a reasonable and diligent manner that resulted in large volumes of fugitive EtO emissions from the facility into the atmosphere. That the facility was able to reduce total EtO emissions from 2014 to 2020 by approximately 46% through improving its required program for detecting and

repairing leaks, faulty equipment, and flawed systems demonstrates the degree to which the Defendants' negligence contributed to the volume of EtO in the air around the facility.

59. Defendants' actions were both a cause in fact and legal cause of the Plaintiff's harms and Mrs. Ellis's death.

60. The facility has at relevant times been in the custody and control of the Defendants.

61. Defendants knew or should have known that the emission of EtO from the facility was a vice or defect creating an unreasonable risk of harm to persons located in the surrounding areas, including the Plaintiff and Mrs. Ellis.

62. Defendants could have prevented the harms suffered by the Plaintiff and Mrs. Ellis through the exercise of reasonable care, namely by conforming their conduct and the facility to the standards of care set forth in the Environmental Regulatory Code and reducing or eliminating the emission of EtO from the facility through effective and well-maintained emissions control systems and leak detection. Defendants chose not to exercise such reasonable care, and their failure is both a cause in fact and legal cause of Plaintiff's damages.

63. Defendants' actions and omissions continue to cause damages to the Plaintiff.

64. Defendants have been, and continue to be, negligent in the following non-exclusive ways:

    a.) Emitting large volumes of EtO into the air around the facility with knowledge of the risks and dangers posed to the neighboring community,

    b.) Failing to inform and warn the neighboring community that they had a high risk of developing cancer as a result of exposure to the EtO released into the air from the facility;

c.) Failing to timely or adequately take steps to lower emissions of EtO to a safe level through properly maintained and operated emissions control systems and equipment;

d.) Failing to operate strictly in compliance with the LDEQ permits issued to the facility to ensure that at the actual volumes and levels of emissions of EtO would be known;

e.) Failing to properly train, monitor, and supervise its employees in the inspection and monitoring of the facility's systems and equipment to ensure adequate control as to the dangerous emissions released into the community;

f.) Failing to implement and maintain a stringent LDAR program and negligently allowing excessive and dangerous levels of fugitive EtO emissions from the facility;

g.) Failing to take proper preventative measures/safeguards to avoid exposing the Plaintiff and Mrs. Ellis to dangerous levels of EtO;

h.) Failing to take proper preventative measures and safeguards to sufficiently protect public health and safety;

i.) Failing to know what it should have known;

j.) Misleading the Plaintiff, Mrs. Ellis, and the community as to the serious health risks and dangers they face as a result of living in close proximity to the facility and inhaling EtO.

**Count 2 –Liability under La. C.C. arts. 667-669**

65. Defendants have a duty under Louisiana's vicinage articles to avoid operations at the facility that cause damages and inconvenience to the facility's neighbors. Defendants are required to use their property - the facility - in such a manner as not to injure their neighbors.

66. Plaintiff and Mrs. Ellis lived near the facility and were, and Mr. Ellis continues to be, continuously exposed to the dangerous emissions of EtO released by the facility, which exposure was a cause of Mrs. Ellis's cancer and death and Plaintiff's risk of developing cancer. Mr. and Mrs. Ellis lived in close proximity to the facility and have been damaged by their exposure to the dangerous emissions released by the facility.

67. Defendants knew or in the exercise of reasonable care should have known that its operations and emissions of EtO from the facility would cause damages persons living near the facility, including Plaintiff and Mrs. Ellis. The damages caused to the Plaintiff could have been prevented if the Defendants had exercised reasonable care to reduce or eliminate the emissions of dangerous chemicals into the air, but Defendants failed to take steps to reduce EtO emissions and still have not reduced EtO emissions to a level demonstrated to be safe and not to cause adverse health effects to the facility's neighboring community.

**DAMAGES**

68. Because of the aforementioned conduct and negligence of Defendants, Plaintiff seeks the following damages:

    a.) Survival damages for the pain and suffering of Mrs. Ellis before her death;

    b.) Wrongful death damages arising from Mrs. Ellis's death; and

    c.) Damages for the fear and increased likelihood of development of cancer and other fatal and debilitating diseases.

69. Plaintiff prays for a trial by jury.

WHEREFORE, Plaintiff prays that, after due proceedings had, there be judgment herein in his favor and against Defendants for such damages as are reasonable in the premises, together with legal interest thereon from date of judicial demand until paid; for all costs of this proceeding; and for all other general and equitable relief to which they are entitled.

    Respectfully Submitted:

*/s/ William A. Barousse*
**RICHARD P. VOORHIES III (#30782)**
**WILLIAM A. BAROUSSE (#29748)**
THE VOORHIES LAW FIRM
1100 Poydras Street
Energy Center, Suite 2810
New Orleans, LA 70163
Phone: 504-875-2223
Fax: 504-875-4882
Email: richard@voorhieslaw.com
Email: william@voorhieslaw.com

-and-

**JENNIFER THORNTON (#27109)**
**BRANDON A. NAQUIN (#39998)**
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Phone: 504-523-1580
Fax: 504-524-0069
jlt@stanleyreuter.com
ban@stanleyreuter.com

*ATTORNEYS FOR PLAINTIFF*